## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RAYMOND RADCLIFFE et al.,<br>    *Plaintiffs*,<br><br>        v.<br><br>AETNA, INC. et al.,<br>    *Defendants*. | No. 3:20-cv-01274-VAB<br>[*rel.* No. 3:20-cv-01321-VAB] |

### RULING AND ORDER ON MOTION TO DISMISS

Raymond Radcliffe and Carol Flaim ("Plaintiffs") have filed this consolidated putative

class action complaint against Aetna, Inc., CVS Health Corporation, the Aetna Benefits Finance

Committee, Larry J. Merlo, Frank M. Clark, Betty Z. Cohen, Jeffrey Garten, Mark T. Bertolini,

Roger N. Farah, Edward J. Ludwig, Eva C. Boratto, Aetna Does 1-20, and CVS Does 1-20

("Defendants"), alleging that Defendants breached their fiduciary duty to Plaintiffs as

participants in Aetna's employee stock ownership plan under § 404 of the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1104, and engaged in prohibited

transactions in violation of ERISA § 406(a) and § 406(b), 29 U.S.C. § 1106(a), (b). *See*

Consolidated Class Action Compl., ECF No. 12 (Nov. 12, 2020) ("Am. Compl.").

Defendants move to dismiss the suit for failure to state a claim upon which relief can be

granted.

For the following reasons, Defendants' motion to dismiss is **GRANTED**.

If Plaintiffs wish to seek leave to file another amended complaint addressing the legal

deficiencies described below, they must do so by October 29, 2021.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

      **A.  Factual Allegations**

          **1.   Aetna, Inc. and the Aetna 401(k) Plan**

Aetna is a wholly owned subsidiary of CVS. Am. Compl. ¶ 29. Before merging with CVS in 2018, Aetna was a diversified health benefits company that offered health insurance products and services. *Id.* ¶ 58.

Between December 3, 2017 and February 20, 2019 (the "Class Period"), Aetna sponsored a 401(k) participant-directed defined contribution plan (the "Plan" or "Aetna Plan"), "a voluntary savings plan that provide[d] retirement income to eligible employees who [were] U.S. employees, employed by Aetna Inc. [ ] or a participating subsidiary company." *Id.* ¶ 42.

Under the Plan, "[n]ew and rehired employees [were] automatically enrolled in the Plan at a 3% pretax contribution rate unless the employee ch[ose] a different rate or opt[ed] out of participation." *Id.* Participants in the Plan were permitted to direct their investment and employer contributions among twenty-two investment options offered by the Plan, including the Aetna Common Stock Fund ("Stock Fund"). *Id.* ¶ 43. This portion of the Plan was designated as an "employee stock ownership plan" ("ESOP"), under which a participant could elect to receive "in cash, dividends that [were] paid on stock in the Stock Fund or else reinvest dividends in the Stock Fund." *Id.* ¶ 44. If the participants did not make an election, their dividends were automatically re-invested in the Stock Fund. *Id.*

Allegedly, "[t]he Plan's investment in Aetna stock units was a material portion of the Plan's assets." *Id.* ¶ 46. From the end of 2016 to December 31, 2017, the Plan's investment in Aetna common stock units, calculated at market price, allegedly rose from $866,271,483 to $1,144,635,702. *Id.* During the same period, participants' investment in Aetna units allegedly

increased from 11.8% of total plan assets to 13.6% and the "dollar amount of Aetna stock units in the Plan" allegedly increased by 32.1%. *Id.*

### 2. The Merger Agreement

In mid-2017, Aetna allegedly began discussions with CVS "to explore whether a combination of Aetna and CVS could be agreed whereby CVS, the larger of the two companies, would in effect take over Aetna and absorb it into CVS." *Id.* ¶ 78.

During these negotiations, Aetna allegedly "had access to an electronic data room containing non-public financial, legal and other information about CVS." *Id.* ¶¶ 78, 117. Aetna's financial advisors and Aetna management also allegedly "met with CVS representatives and financial advisors to discuss the financial information." *Id.* ¶ 78.

On December 3, 2017, CVS and Aetna announced the execution of a merger agreement ("Merger Agreement") under which Aetna shareholders would receive $145 per share in cash and 0.8378 shares of CVS common stock for each share of Aetna stock. *Id.* ¶ 79. The transaction allegedly valued Aetna at approximately $207 per share, or $77 billion, including $8 billion in net debt. *Id.* In the Merger Agreement, CVS and Aetna allegedly agreed "to keep each other informed of each other's operations and financial condition." *Id.* ¶ 90.

On December 1, 2017, the last trading day before the Merger Agreement was announced, "Aetna was trading at approximately $177 per share." *Id.* ¶ 80. After the announcement of the Merger Agreement, Aetna's stock price allegedly "increased to meet the implied value of [the] CVS Merger consideration." *Id.*

### 3. CVS's Acquisition of Omnicare

Plaintiffs allege that "in 2017 and 2018 CVS was facing profound risks to its operations which were not fully disclosed to, nor appreciated by[,] the investing public." *Id.* ¶ 6.

3

On August 18, 2015, CVS acquired Omnicare, "a provider of pharmaceuticals and related pharmacy services to [long-term care] facilities (*e.g.*, assisted living, skilled nursing, and senior centers) and a provider of specialty pharmacy and commercialization services for the bio-pharmaceutical industry." *Id.* ¶ 60. CVS allegedly "promoted the Omnicare acquisition as a key move to expanding CVS's business throughout multiple markets related to pharmaceutical care." *Id.* ¶ 61.

CVS allegedly acquired Omnicare for $9.6 billion and assumed long-term debt with a fair value of approximately $3.1 billion. *Id.* ¶ 61. At acquisition, CVS allegedly estimated that the fair value of the Omnicare assets it acquired "included $9.1 billion of goodwill." *Id.*

After the acquisition, CVS's retail segment's long-term care ("LTC") unit was "largely compris[ed]" of Omnicare. *Id.* ¶ 60. Allegedly, "[b]ecause CVS merged the Omnicare Long-Term Care business into its Retail segment to create the Retail/LTC segment, the Company largely allocated the Omnicare goodwill to its Retail/LTC segment." *Id.* ¶ 63. As a result, "CVS reported that '[g]oodwill of $8.6 billion was allocated to the Retail/LTC Segment[.]'" *Id.* Plaintiffs allege that of the $8.6 billion allocated to the retail/LTC segment, "$6.4 billion was allocated to the Omnicare Long-Term Care reporting unit, and . . . is the goodwill that is at issue in this case." *Id.*

In 2016, CVS's Retail/LTC segment allegedly lost two pharmacy contracts, "causing CVS stock to drop 20%." *Id.* ¶ 69. By late 2016, CVS allegedly "was not realizing all of the expected benefits of the Omnicare acquisition," and its retail pharmacy segment "faced significant reimbursement pressure." *Id.* Plaintiffs allege that by early 2017, CVS knew that it was "experiencing factors indicating that its Omnicare-related goodwill asset was impaired or at substantial risk of experiencing an impairment write down." *Id.* ¶ 70.

Allegedly, as CVS "steadily los[t] LTC market share in 2017, CVS responded to these negative factors . . . by targeting LTC pharmacies for acquisition[.]" *Id.* ¶ 71.

In early 2017, CVS Omnicare acquired ModernHealth, "a large Southern California LTC pharmacy services business which . . . generat[ed] over $70 million in sales annually." *Id.* ¶ 72. In the third quarter of 2017, allegedly "all but 25 people at Modern Health were terminated by CVS/Omnicare." *Id.* In late 2017, CVS also acquired Pharmore Drugs, "the largest independently owned LTC pharmacy in Illinois." *Id.* Following the acquisition, CVS allegedly "filed WARN notices [required] in Illinois . . . due to CVS'[s] plan to engage in massive layoffs at Pharmore." *Id.*

In late 2017, CVS allegedly continued to experience "reimbursement pressure at its retail/LTC business," which "had been cited by CVS as a cause [of] CVS'[s] 17% year over year net income decline" in the first quarter of 2017. *Id.* ¶ 74.

### 4.  Government Investigation of Omnicare

On June 1, 2015, Omnicare was sued "in a qui tam action for violating the Federal False Claims Act, and state and local false claims acts, by seeking reimbursement for drugs illegally delivered to patients in Omnicare's assisted living and skilled nursing facility clients." *Id.* ¶ 104.

In October 2015, following its acquisition of the company, CVS received a Civil Investigative Demand from the United States Attorney's Office for the Southern District of New York requesting information and documents relating to Omnicare's "cycle fill process," or process of regularly refilling prescriptions for assisted living facilities. *Id.* ¶ 64; Ex. 8 to Mot. to Dismiss at 69, ECF No. 22-10 (Dec. 22, 2020) ("Ex. 8 to Defs.' Mot.").

On December 13, 2019, the original complaint against Omnicare was unsealed. Am. Compl. ¶ 104.

On December 17, 2019, after several years of investigation, the U.S. Department of Justice intervened in the *qui tam* action on behalf of the United States and filed a lawsuit against Omnicare and CVS under the False Claims Act. *Id.* ¶¶ 64, 104. The Department of Justice complaint alleged that from 2010 to 2018, CVS "fraudulently billed federal healthcare programs for hundreds of thousands of non-controlled prescription drugs dispensed on stale, invalid prescriptions to elderly and disabled individuals." *Id.* ¶ 64. This "rollover prescription scheme" allegedly affected Omnicare's assisted living facilities, "which represented 24% of Omnicare's prescription volume as of January 2017," and encompassed patients in more than three thousand residential long-term care facilities. *Id.* ¶¶ 67–68.

Plaintiffs allege that "[r]eported results at Omnicare had been inflated by revenues earned in the [i]llegal [p]rescription [sc]heme." *Id.* ¶ 7.

### 5. Aetna's Merger with CVS

On January 4, 2018, CVS filed with the U.S. Securities and Exchange Commission ("SEC") a preliminary Registration Statement on Form S-4 for the issuance of CVS shares to be exchanged for Aetna stock in the merger. *Id.* ¶ 81. The SEC declared the Registration Statement effective on February 9, 2018, and Aetna "provided plan participants with the Joint Proxy Prospectus[,] which included the substantive portions of the Registration Statement." *Id.* Aetna allegedly provided these documents in order "to solicit plan participants['] vote in favor of approval of the merger and to provide to [them] information about the CVS stock units they would receive for their Aetna stock units in their 401(k)." *Id.*

The Joint Proxy Prospectus, which was provided to the Plan participants, "expressly incorporated by reference several SEC filings," including CVS's 2016 and 2017 annual reports; quarterly reports for the fiscal quarters ending on March 31, 2017, June 30, 2017, and September

30, 2017; and CVS's Proxy Statement on Schedule 14A filed on March 31, 2017. *Id.* ¶ 91.

The Joint Proxy Prospectus allegedly disclosed that "[t]he fair value[ ] of [CVS's] LTC . . . reporting unit[ ] exceeded [its] carrying values by 7%[.]" *Id.* ¶ 93. CVS also allegedly stated that "[t]he balance of goodwill for [CVS's] LTC and RxCrossroads reporting units at December 31,[ ] 2016 was approximately $6.4 billion and $0.6 billion, respectively." *Id.*

On November 6, 2017, CVS disclosed that, for the quarterly period ending on September 30, 2017,

> the results of our annual goodwill impairment test resulted in the fair value of our LTC reporting unit exceeding its carrying value by approximately 1%. Our multi-year cash flow projections for our LTC reporting unit have declined from the prior year due to customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, and client retention rates. Our projected discounted cash flow model assumes future script growth from our senior living initiative and the impact of acquisitions. Such projections also include expected cost savings from labor productivity and other initiatives. Our market multiple method is heavily dependent on earnings multiples of market participants in the pharmacy industry, including certain competitors and suppliers. If we do not achieve our forecasts, given the small excess of fair value over the related carrying value, as well as current market conditions in the healthcare industry, it is reasonably possible that the operational performance of the LTC reporting unit could be below our current expectations in the near term and the LTC reporting unit could be deemed to be impaired by a material amount.

Ex. 7 to Mot. to Dismiss at 39, ECF No. 22-9 (Dec. 22, 2020) ("Ex. 7 to Defs.' Mot.").

On January 4, 2018, Defendants held a "CVS Health 2018 Guidance Call" with securities analysts, during which Defendants allegedly stated that CVS "expect[ed] solid script growth driven by new initiatives tailored toward assisted living facilities and benefits from acquisition growth. As a result, for the entire Retail/Long-Term Care segment, [CVS] expect[ed] revenue growth of 2.5% to 4%." Am. Compl. ¶ 103.

On February 14, 2018, CVS filed its 2017 annual report. *Id.* ¶ 94. The Form 10-K "contained representations similar to those in the 2016 Form 10-K and was also expressly incorporated into the [Joint Proxy Prospectus]." *Id.* CVS disclosed that "an impairment analysis had been performed during the fiscal year end[ing] December 31, 2017," and "[t]he fair value[ ] of [CVS's] LTC reporting unit[ ]. . . exceeded [its] carrying value[ ] by approximately 1%." *Id.* ¶ 95.

On March 13, 2018, CVS and Aetna shareholders approved the Merger Agreement, "including the provisions whereby Aetna plan participants' Aetna units would be exchanged for CVS units." *Id.* ¶¶ 14, 115.

On May 2, 2018, CVS filed its Form 10Q for the period ending on March 31, 2018. Ex. 10 to Mot. to Dismiss, ECF No. 22-12 (Dec. 22, 2020) ("Ex. 10 to Defs.' Mot."). In the form, CVS disclosed that its "LTC reporting unit continue[d] to face challenges that [could] affect [CVS's] ability to grow the business at the rate that [CVS] had originally estimated when [it] made the acquisition of Omnicare and when [it] performed [its] prior year annual goodwill impairment test." *Id.* at 42. The company stated that "[i]f [CVS] d[id] not achieve [its] forecasts, . . . it is reasonably possible that the operational performance of the LTC reporting unit could be below [its] current expectations in the near term and the goodwill of the LTC reporting unit could be deemed to be impaired by a material amount." *Id.*

In June 2018, CVS allegedly updated its LTC unit forecasts "to reflect the sharply declining LTC business" since early 2017. Am. Compl. ¶ 116.

In August 2018, CVS announced that its "2018 second quarter results (April 1, 2018 to June 30, 2018) represented a $3.9 billion charge related to impaired goodwill for its LTC unit related to poor actual and projected Omnicare performance." *Id.* (emphasis omitted); Ex. 11 to

Mot. to Dismiss at 46, ECF No. 22-13 (Dec. 22, 2020) ("Ex. 11 to Defs.' Mot.").

CVS further disclosed,

> Though we believe the financial projections used to determine the fair value of the LTC reporting unit as of June 30, 2018 are reasonable and achievable, our LTC reporting unit may continue to face challenges that may affect our ability to grow the business at the rate we estimated when we performed such goodwill impairment test. . . . If we do not achieve our forecasts, given that the fair value and the carrying value of the LTC reporting unit were the same as of June 30, 2018, it is reasonably possible in the near term that the goodwill of the LTC reporting unit could be deemed to be impaired again by a material amount.

Ex. 11 to Defs.' Mot. at 46.

On November 6, 2018, CVS reported that it had performed its required annual impairment tests of goodwill, and "[t]he results of the impairment tests indicated that there was no impairment of goodwill." Ex. 12 to Mot. to Dismiss at 46, ECF No. 22-14 (Dec. 22, 2020). CVS noted that "[t]he fair value of [its] LTC reporting unit exceeded its carrying value by approximately 2%," but "[i]f [CVS] d[id] not achieve [its] forecasts, . . . it [was] reasonably possible in the near term that the goodwill of the LTC reporting unit could be deemed to be impaired again by a material amount." *Id.*

On November 28, 2018, the merger closed, with Aetna shareholders receiving cash and CVS stock units valued at $80 per share in exchange for their Aetna stock. Am. Compl. ¶ 19. The Plan merged into the CVS Health Future Fund 401(k) Plan on January 1, 2020. *Id.* ¶ 1.

On February 20, 2019, CVS issued a press release announcing its fourth quarter and full year 2018 results and providing 2019 full year guidance. *Id.* ¶ 119. In the release, CVS announced that it would take a $2.2 billion impairment charge on the Omnicare goodwill for the fourth quarter of 2018. *Id.* CVS stated that it had "'continued to experience' materially rising costs and poor financial results during the fourth quarter of 2018" due to "'lower occupancy rates

in skilled nursing facilities, significant deterioration in the financial health of numerous skilled nursing facility customers which resulted in a number of customer bankruptcies in 2018, and continued facility reimbursement pressures.'" *Id.*

In 2019, six months after the merger closed, the CVS stock price allegedly was trading in the "$60 per share range, far below the price of CVS shares during most of 2018." *Id.* ¶ 124.

Plaintiffs allege that because the Plan's "holdings in Aetna stock units comprised a significant percentage of the overall value of the assets the Plan held on behalf of its beneficiaries after the merger was approved, the long-term retirement savings of Plaintiffs and members of the Class were dependent, to a substantial degree, on the performance of CVS common stock." *Id.* ¶ 16.

### B.  Procedural History

On August 28, 2020, Raymond Radcliffe filed his putative class action complaint. Class Action Compl., ECF No. 1 (Aug. 28, 2020); Corrected Class Action Compl., ECF No. 2 (Aug. 28, 2020).

On November 3, 2020, Mr. Radcliffe and Ms. Flaim moved to consolidate this case with *Flaim v. CVS Health Corp. et al.*, No 3:20-cv-01321, and to file an amended complaint. Pls.' Consented-To Mot. to Consolidate Related Cases and File a Consolidated Am. Compl., ECF No. 8 (Nov. 3, 2020). The Court granted Plaintiffs' motion on November 4, 2020. Order, ECF No. 9 (Nov. 4, 2020).

On November 12, 2020, Plaintiffs filed a consolidated class action complaint. Am. Compl.

On December 22, 2020, Defendants filed their motion to dismiss the consolidated complaint. Mot. to Dismiss, ECF No. 22 (Dec. 22, 2020); Mem. of Law in Supp. of Defs.' Mot. to Dismiss, ECF No. 22-1 (Dec. 22, 2020) ("Defs.' Mot.").

On February 4, 2021, Plaintiffs filed their opposition to Defendants' motion to dismiss. Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, ECF No. 38 (Feb. 4, 2021) ("Opp'n").

On February 25, 2021, Defendants filed a reply in support of their motion to dismiss. Reply Mem. of Law in Supp. of Defs.' Mot to Dismiss, ECF No. 39 (Feb. 25, 2021) ("Defs.' Reply").

On March 5, 2021, Defendants filed a notice of supplemental authority relating to a New York state court case cited by Plaintiffs in their opposition to their motion to dismiss. Notice of Suppl. Authority in Supp. of Defs.' Mot. to Dismiss the Am. Compl., ECF No. 40 (Mar. 5, 2021). Plaintiffs filed a reply to Defendants' notice of supplemental authority on March 19, 2021. Resp. to Notice of Suppl. Authority Submitted by Defs., ECF No. 41 (Mar. 19, 2021).

On July 23, 2021, Plaintiffs filed a notice of supplemental authority regarding a federal district court decision relating to the False Claims Act action against Omnicare and CVS. Notice of Suppl. Authority in Opp'n to Defs.' Mot. to Dismiss, ECF No. 43 (July 23, 2021). Defendants filed a reply to Plaintiffs' notice of supplemental authority on July 29, 2021. Resp. to Pls.' Notice of Suppl. Authority, ECF No. 45 (July 29, 2021).

## II.   STANDARD OF REVIEW

To survive a motion to dismiss under 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility

standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Recs. LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 358 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also take judicial notice of matters of public record, including documents filed with public bodies,

such as articles of incorporation. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (taking judicial notice of contents of corporate filings with the SEC); *Banks v. Consumer Home Mortg.*, No. 01—cv-8058, 2003 WL 21251584, at *6 n.7 (E.D.N.Y. Mar. 28, 2003) (taking judicial notice of public record on file with Secretary of State for Georgia); *see also AW Indus., Inc. v. Sleepingwell Mattress Inc.*, No. 10-cv-04439 (NGG) (RER), 2011 WL 4404029, at *4 (E.D.N.Y. Aug. 31, 2011) (noting that the Court can take judicial notice of certificates of amendment and incorporation to analyze the true name of a legal entity in resolving a motion to dismiss), *report and Recommendation adopted by* 2011 WL 4406329 (E.D.N.Y. Sept. 21, 2011).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (internal quotation marks omitted).

### III.     DISCUSSION

Defendants move to dismiss the Amended Complaint for failure to state a claim. As a threshold matter, they contend that Plaintiffs have not plausibly alleged that any Defendant other than the Aetna Benefits Finance Committee had a fiduciary responsibility for the Plan's investments. They further contend that all counts fail because Plaintiffs have not adequately alleged that material, non-public information was omitted from Defendants' disclosures to Plan participants. In addition, Defendants argue that Plaintiffs have failed to state a claim as to all counts on the merits.

The Court will address these arguments in turn.

#### A.  Fiduciary Status

"In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 366 (2d Cir. 2014) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)); *see also* 29 U.S.C. § 1002(21)(A). Fiduciaries under ERISA are so named in the plan or exercise "discretionary control" over the management or administration of the plan or its assets. 29 U.S.C. §§ 1102(a), 1002(21)(A).

ERISA provides that a person is a fiduciary "to the extent" the person (1) "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," (2) "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so," or (3) "has any discretionary authority or discretionary responsibility in the administration of such plan." 29

14

U.S.C. § 1002(21)(A). "Under this definition, a person may be an ERISA fiduciary with respect to certain matters but not others[.]" *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987). "[F]iduciary status exists only 'to the extent' that the person 'has or exercises the described authority or responsibility' over a plan." *Coulter*, 753 F.3d at 366 (quoting *F.H. Krear & Co.*, 810 F.2d at 1259).

Plaintiffs allege violations of ERISA fiduciary duty by the Aetna Benefits Finance Committee ("ABFC"), CVS, Aetna, and various officers and directors of Aetna and CVS.

Defendants do not challenge the fiduciary status of the ABFC, but argue that Aetna and CVS did not have the authority or a duty "to make investment-related decisions for the Plan, a responsibility the Plan document vested in the ABFC." Defs.' Mot. at 20. They further contend that the individually named Aetna Defendants who served on Aetna's Compensation and Talent Management Committee "had no authority over the Plan's *investments*." *Id.* at 22 (emphasis in original). As to the remaining individual CVS and Aetna officers and directors, Defendants argue that the drafting or preparation of CVS's Registration Statement and Joint Proxy Prospectus are "corporate dut[ies]" that "do[ ] not render an individual a Plan fiduciary." *Id.* at 21.

Plaintiffs argue that Aetna, CVS, and the individually named Defendants acted as "functional fiduciaries when they provided the Offering Documents to the Plan participants." Opp'n at 16 (emphasis omitted). Specifically, they contend that the disclosures in the Joint Proxy Prospectus and Registration Statement "were provided to Plan Participants as plan fiduciary actions" because "the Plan required [these disclosures] to be provided to plan participants." *Id.* at 17. Plaintiffs additionally assert that CVS acquired fiduciary status before the closing of the merger because the Plan participants qualified as ERISA "participants" in CVS's employee benefit plan. *Id.* at 20.

15

The Court disagrees.

### 1. Aetna and CVS

The Aetna 401(k) Plan provides that Aetna is the Plan Administrator and, in this capacity, a named fiduciary with respect to the Plan, but specifically excludes responsibility "for the duties assigned herein to the [Aetna] Benefit Finance Committee and Trustee." Sealed Ex. 3 to Mot. to Dismiss § 13.1(b), ECF No. 25-2 (Dec. 23, 2020) ("Ex. 3 to Defs.' Mot."). Under the Plan, the ABFC "periodically choose[s] the available Investment Funds under the Plan and periodically review[s] and make[s] any changes with respect to the available Investment Funds as the Benefit Finance Committee, in its sole discretion, determines to be appropriate[.]" *Id.* § 5.7. The Trustee, in turn, is responsible for "utiliz[ing] its best efforts to distribute or cause to be distributed in a timely fashion to each Participant such . . . written information . . . as will be distributed to stockholders of the Company in connection with any such vote or tender or exchange offer and a voting or tender or exchange offer instruction form for return to the Trustee or its designee." *Id.* § 14.8(b).

Under these provisions, the ABFC, not Aetna, was responsible for the Plan's investment decisions, and the Trustee was responsible for distributing to Plan participants "[i]nformation relating to the purchase, holding, and sale of Stock." *Id.* § 14.8(a). Plaintiffs therefore have not sufficiently alleged that Aetna acted in a fiduciary capacity with respect to investments in the Stock Fund or the distribution of the Joint Proxy Prospectus to the Plan participants. *Bekker v. Neuberger Berman Grp. LLC*, No. 16 CV 6123-LTS-BCM, 2018 WL 4636841, at *10 (S.D.N.Y. Sept. 27, 2018) ("allegation that Neuberger Berman Group LLC retained residual responsibility for investment decisions is implausible" given that the Plan "specifically excludes" these duties from the company's responsibilities as Plan Administrator).

Plaintiffs argue, citing *Varity Corporation v. Howe*, 516 U.S. 489 (1996), that Aetna "exercised discretionary authority or control over plan assets . . . when [it] provided materially misleading Offering Documents to Plan Participants [under] the Plan." Opp'n at 19. But in *Varity*, the Supreme Court reasoned that the company "spoke, in significant part, in its capacity as plan administrator" when it called employees to a "special meeting" in order "[t]o persuade the employees of the failing divisions to accept the change of employer and benefit plan." 516 U.S. at 494–95, 501; *see also Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 84 (2d Cir. 2001) (assuming fiduciary duty where General Electric Company "undertook a serious communications effort to disclose the post-closing benefits that Lockheed would provide," including the distribution of "a letter to all of the employees[ ] assuring them that they would receive 'comprehensive information on [their] benefits . . . and the terms for transition to [Lockheed's] generally comparable benefits package'"). Here, the only materially false and misleading statements alleged by Plaintiffs are those contained in SEC filings that were later incorporated by reference in the Joint Proxy Prospectus. *See* Am. Comp. ¶¶ 91–92 ("The Offering Documents expressly incorporated by reference several SEC filings . . . . These documents failed to provide plan participants with truthful, accurate, and complete information about material risks to CVS['s] financial condition and results of operations[.]"). To the extent Aetna was involved in the preparation of these filings, it did so "in a corporate, rather than ERISA fiduciary, capacity." *Gearren v. McGraw-Hill Cos.*, 660 F.3d 605, 611 (2d Cir. 2011).

The same analysis applies to CVS, which is not a named fiduciary or otherwise referenced in the Plan. During the merger negotiations, CVS "was not a fiduciary of the [Aetna] [P]lan because it had no authority or responsibility over it." *Flanigan*, 242 F.3d at 87. Plaintiffs contend that CVS, before the closing of the merger, "could . . . have been a fiduciary due to the

control it could exert over Aetna's business operations, stock and fiduciary communications," Opp'n at 20, but reference provisions of the Merger Agreement permitting Aetna and CVS to access each other's properties, books, contracts, records, and information concerning their businesses, properties, and personnel, Am. Compl. ¶ 117. These allegations, without more, do not establish that CVS exercised fiduciary responsibility over the Plan's investments or the distribution of the Proxy and Registration Statement.

Plaintiffs argue that before the merger, CVS was a fiduciary to Aetna Plan participants because, under ERISA's statutory definition of the term, these individuals were "participants" who "may become eligible to receive" benefits from CVS's employee benefit plan. Opp'n at 20. Plaintiffs do not allege, however, that CVS had a fiduciary obligation to disclose to Plan participants details of the CVS, rather than the Aetna, plan. The Amended Complaint's allegations focus instead on disclosures relating to the "risk of investing in Aetna Stock units" under the Aetna Plan. Am. Compl. ¶¶ 98, 113; *id.* ¶ 1 (alleging that the Aetna 401(k) Plan did not transition into the CVS Health Future Fund 401(k) Plan until January 1, 2020).

Accordingly, Aetna and CVS did not act in a fiduciary capacity with respect to the conduct alleged in the Amended Complaint.

### 2.  Individual CVS and Aetna Defendants

As to the individual Defendants, Plaintiffs have not plausibly alleged that Larry Merlo, then the Chief Executive of CVS; Eva Boratto, CVS's then-Executive Vice President and Chief Accounting Officer; and Mark Bertolini, Aetna's then-Chairman and CEO, acted as fiduciaries by drafting or preparing CVS's Joint Proxy Prospectus or Registration Statement. ERISA holds fiduciaries liable to the extent that they were "acting as a fiduciary . . . when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Mr. Merlo, Ms. Boratto,

and Mr. Bertolini signed or prepared the SEC filings in their corporate, rather than a fiduciary, capacity.

Even assuming, as Plaintiffs allege, that these filings were provided to Plan participants as an incident of their rights under the Plan and Aetna Stock Fund, Am. Compl. ¶ 85, "[these] connections [are] insufficient to transform those documents into a basis for ERISA claims against their signatories." *In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 760 (S.D.N.Y. 2003); *Gearren*, 660 F.3d at 610–11 (defendants who signed or prepared SEC filings "that were later incorporated into the Plans' Summary Plan Descriptions" acted in a corporate, rather than ERISA fiduciary, capacity); *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 756 F. Supp. 2d 330, 357 (S.D.N.Y. 2010) ("SEC filings and communications that included statements about the Company's financial condition did not become ERISA fiduciary communications simply because they were received by Plan Participants.").

Plaintiffs also have not sufficiently alleged that the members of Aetna's Compensation and Talent Management Committee, including Frank Clark, Betsy Cohen, Rogers Farah, Jeffrey Garten, and Edward Ludwig,[1] "had discretionary power over fiduciary functions for the Aetna Stock Plan." Am. Compl. ¶¶ 34–35. Plaintiffs allege that the Compensation and Talent Management Committee oversaw Aetna's "compensation and benefits plans, policies and programs of the Company," *id.* ¶ 34, but these responsibilities were limited to the design of the Plan's compensation and benefits, not the Plan's investments, *see* Ex. 18 to Mot. to Dismiss at 9, ECF No. 22-20 (Dec. 22, 2020) ("The Compensation Committee is directly responsible for . . .

---

[1] Plaintiffs allege that Aetna Doe Defendants 11-20 ("Aetna Does 11-20") "include members of Aetna's board-level 'Committee on Compensation and Talent Management.'" Am. Compl. ¶ 34.

establishing the Chief Executive Officer's and other executive officers' compensation levels . . .

.").

Accordingly, Plaintiffs have not plausibly alleged that Aetna, CVS, and their individual

officers and directors functioned as ERISA fiduciaries, and Counts Three,[2] Four,[3] Five, Six, and

Seven, which are asserted against these Defendants as fiduciaries, will be dismissed.

## B. Count One – Duty of Prudence

"The central purpose of ERISA is 'to protect beneficiaries of employee benefit plans.'"

*Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 63 (2d Cir. 2016) (quoting *Slupinski v.*

*First Unum Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir. 2009)). "ERISA requires fiduciaries to use

'the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent

man acting in a like capacity and familiar with such matters would use in the conduct of an

---

[2] Plaintiffs argue in the alternative that Aetna and CVS are liable as ERISA fiduciaries under the doctrine of *respondeat superior*. This argument fails because Plaintiffs have not alleged a breach of a fiduciary duty by a Defendant in this case. In addition, "[c]ourts that have recognized claims based on a theory of *respondeat superior* tend to require factual allegations that support a claim that the corporation exercised *de facto* control over ERISA fiduciary employees." *In re Bank of Am.*, 756 F. Supp. 2d at 347. Plaintiffs have not sufficiently alleged that Aetna or CVS exercised control over ERISA fiduciary employees. *Crowley ex rel. Corning, Inc., Inv. Plan v. Corning, Inc.*, 234 F. Supp. 2d 222, 228 (W.D.N.Y. 2002) (rejecting *respondeat superior* theory where "[t]he Amended Complaint contains no factual allegations which support a claim that Corning had *de facto* control over the Committee members").

[3] In Count Four, Plaintiffs allege that CVS, Aetna, Mr. Merlo, Mr. Bertolini, and Ms. Boratto breached their duty of loyalty by failing to provide complete and accurate information regarding the risks of investing in the Aetna Stock Fund. As discussed below, Plaintiffs have not stated this claim for the additional reason that they do not plausibly allege that Defendants made statements they knew to be false. *In re Citigroup ERISA Litig.*, 662 F.3d 128, 144 (2d Cir. 2011), *abrogated on other grounds*, *Fifth Third Bancorp. v. Dudenhoeffer*, 573 U.S. 409 (2014) ("A fiduciary . . . may only be held liable for misstatements when 'the fiduciary knows those statements are false or lack a reasonable basis in fact'" (quoting *Flanigan*, 242 F.3d at 84)); *Gearren*, 660 F.3d at 611 (affirming dismissal of duty to inform claim as to plan administrator where "[p]laintiffs have not provided any specific allegations as to how [the plan administrator] knew or should have known that S&P's rating practices were improper or that, consequently, the SEC filings contained misstatements or omissions"). Plaintiffs, in effect, argue that Defendants failed to provide participants with information regarding the expected future performance of CVS stock. But the Second Circuit "has held that an ERISA fiduciary 'has no duty to disclose to plan participants information additional to that required by ERISA.'" *Jacobs v. Verizon Comms., Inc.*, 16 Civ. 1082 (PGG), 2017 WL 8809714, at *13 (S.D.N.Y. Sept. 28, 2017) (quoting *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 99, 102 (2d Cir. 2005)); *In re Citigroup ERISA Litig.*, 662 F.3d at 143 (declining to recognize "a duty to provide participants with nonpublic information pertaining to specific investment options").

enterprise of a like character and with like aims.'" *Pension Benefit Guar. Corp. ex rel. St.*

*Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 709 (2d

Cir. 2013) (quoting 29 U.S.C. § 1104(a)(1)(B)).

This duty is measured "according to the objective prudent person standard developed in

the common law of trusts." *Rinehart*, 817 F.3d at 63 (citation omitted). ERISA's "fiduciary duty

of care . . . requires prudence, not prescience." *Id.* (internal quotation marks omitted) (citing

*Pension Benefit Guar. Corp.*, 712 F.3d at 716).

In *Fifth Third Bancorp. v. Dudenhoffer*, 573 U.S. 409 (2014), the Supreme Court

"explained that a breach of prudence claim against an ESOP fiduciary must overcome certain

pleading hurdles, depending on whether the claim is premised on public information that was

available to the markets or, alternatively, whether the information was known exclusively to

insiders." *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 108 (S.D.N.Y. 2018).

Specifically, "where a stock is publicly traded, allegations that a fiduciary should have

recognized from publicly available information alone that the market was over- or undervaluing

the stock are implausible as a general rule, at least in the absence of special circumstances." *Fifth*

*Third*, 573 U.S. at 426. "In other words, a fiduciary usually is not imprudent to assume that a

major stock market . . . provides the best estimate of the value of the stocks traded on it that is

available to him." *Id.* at 427 (internal quotation marks omitted).

In the absence of "special circumstances," *Fifth Third*, 573 U.S. at 426, a duty-of-

prudence claim therefore "may lie against ESOP fiduciaries only where it is alleged that

fiduciaries 'behaved imprudently by failing to act on the basis of *nonpublic* information that was

available to them because they were [corporate] insiders.'" *Jander v. Ret. Plans Comm. of IBM*,

910 F.3d 620, 626 (2d Cir. 2018) (emphasis in original) (quoting *Fifth Third*, 573 U.S. at 427–28).

Plaintiffs allege that the ABFC and the Aetna Doe Defendants[4] breached their fiduciary duty of prudence under ERISA § 404(a) by failing to "remove[ ] the [Aetna] Stock Fund as an investment option in the plan," "migrate[ ] assets out of [t]he Plan," "clos[e] [the Aetna Stock Fund] to new investments," or "terminate[ ] the dividend reinvestment option." Am. Compl. ¶ 154. They further allege that CVS Does 1-10 breached their fiduciary duty "by failing to diversify out of CVS stock units and by allowing, after the merger closed, CVS stock units to constitute an investment alternative." *Id.* ¶ 155.

Defendants move to dismiss this claim, arguing that Plaintiffs allege that CVS was aware of and failed to disclose material non-public information to the Plan participants, but "purport[ ] to establish that claim entirely through publicly disclosed information about the risks facing CVS's business." Defs.' Mot. at 14 (emphasis omitted). Defendants assert, for example, that CVS "fully disclosed, in every Form 10-Q and 10-K during the Class Period, the potential impact that the business challenges it encountered could have on its goodwill estimate." *Id.* at 15.

Plaintiffs respond that the Proxy and Registration Statement "failed to provide [P]lan participants with truthful, accurate and complete information about the material risks to CVS['s] financial condition" because its disclosures suggested that "the LTC business was not experiencing material adverse trends but rather portrayed it as financially stable and a 'reliable growth driver' for Defendants." Opp'n at 8–9.

The Court disagrees.

---

[4] Plaintiffs allege that Aetna Doe Defendants 1-10 ("Aetna Does 1-10") were members of the ABFC. Am. Compl. ¶ 33.

Plaintiffs contend that at the time the Proxy and Registration Statement were provided to Plan participants, Defendants failed to disclose "risks to the value of CVS stock and thus to the value of Aetna stock units in the Plan," namely, (1) the deterioration of CVS's financial condition and expected earnings "as a result of rising costs and poor results" in the LTC business, (2) CVS's "acquisitions of LTC pharmacies to compensate for the declining LTC business and/or [to] mask the expected LTC goodwill impairment" before the merger, (3) CVS's failure to "undertak[e], disclos[e], and report[ ] the risks of write-downs to LTC goodwill throughout 2017," and (4) Omnicare's alleged roll-over prescription scheme. *Id.* ¶ 113.

Plaintiffs have not sufficiently alleged, however, that there was material, non-public information to be disclosed. As the Amended Complaint alleges, CVS's loss of "two huge pharmacy contracts" in 2016 caused CVS's "stock price to drop more than 20%." *Id.* ¶¶ 7, 69. Plaintiffs argue that CVS acquired other LTC pharmacies "to mask the expected LTC goodwill impairment" before the merger, *id.* ¶ 113, but allege that by late 2016, analysts publicly recognized that CVS "was not realizing all of the expected benefits of the Omnicare acquisition," in part due to "significant reimbursement pressure." *Id.* ¶ 69. In November 2018, ModernHealth also publicly filed a lawsuit against CVS relating to CVS's acquisition of the company and termination of its employees. *Id.* ¶ 72.

Notably, CVS disclosed specific risks to its Retail/LTC business in its public filings with the SEC. On November 6, 2017, before the start of the Class Period, CVS reported that for the quarterly period ending on September 30, 2017, the fair value of its LTC reporting unit exceeded its carrying value by approximately 1%, less than the 7% it had reported for the previous year. Ex. 7 to Defs.' Mot. at 39. CVS attributed the decline in its "multi-year cash flow projects for

[the] LTC reporting unit to customer reimbursement pressures, industry trends such as lower

occupancy rates in skilled nursing facilities, and client retention rates." *Id.*

In addition, the company noted that its "projected discounted cash flow model assumes

future script growth from our senior living initiative," as well as "the impact of acquisitions." *Id.*

CVS cautioned that

> [i]f we do not achieve our forecasts, given the small excess of fair
> value over the related carrying value, as well as current market
> conditions in the healthcare industry, it is reasonably possible that
> the operational performance of the LTC reporting unit could be
> below our current expectations in the near term and the LTC
> reporting unit could be deemed to be impaired by a material amount.

*Id.* This information was both publicly disclosed and expressly incorporated by reference in the

Proxy and Registration Statement provided to Plan participants. Am. Compl. ¶ 91.

CVS repeated these disclosures in its 2017 annual report. Ex. 8 to Defs.' Mot. at 22. And,

in its quarterly report for the period ending on March 31, 2018, the company disclosed that the

"LTC reporting unit continues to face challenges that may affect [CVS's] ability to grow the

business at the rate that [CVS] had originally estimated when [it] made the acquisition of

Omnicare and when [it] performed [its] prior year annual goodwill impairment test." Ex. 10 to

Defs.' Mot. at 42. These challenges "include[d] customer reimbursement pressures, lower

occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous

skilled nursing facility customers, and client retention rates." *Id.*

Plaintiffs argue that Defendants also failed to disclose to Plan participants Omnicare's

alleged roll-over prescription scheme. CVS disclosed its receipt of a federal Civil Investigative

Demand relating to Omnicare's roll-over prescription practices, however, in SEC filings during

the Class Period. *See, e.g.*, Ex. 8 to Defs.' Mot. at 69. Plaintiffs suggest that these disclosures did

not account for the fact that the LTC business's financial results "were inflated by the [roll-over

prescription] scheme, which represented 24% of Omnicare's prescription volume as of January 2017 and which[,] internal audits concluded[,] . . . often approached or exceeded 50% of all prescriptions filled." Opp'n at 9 (internal quotation marks omitted). But Plaintiffs argue that the alleged Omnicare scheme caused CVS to undertake "counter-productive measures" to "forestall goodwill impairment," such as by purchasing additional LTC pharmacies and terminating employees, measures which, as discussed above, were publicly disclosed. *Id.*

Moreover, Plaintiffs have not sufficiently alleged that the ABFC knew or should have known the details of Omnicare's roll-over prescription practices. The Amended Complaint alleges that "Defendants knew or should have known of the material deterioration in Omnicare's business and the probability of a material write-down of assets because Aetna and CVS had access to each other's 'properties, books, contract, records and information concerning . . . business, properties and personnel'" under the Merger Agreement. Am. Compl. ¶ 117. Plaintiffs do not allege, however, that the ABFC knew or should have known of Omnicare's prescription roll-over practices based on these communications.

They do not explain, for example, what, if any, records were shared with the ABFC during the merger negotiations. Indeed, Plaintiffs allege that the 2015 *qui tam* action against Omnicare was sealed until December 2019, when the U.S. Department of Justice publicly intervened in the suit. *Id.* ¶ 104. Given these allegations, it is implausible to infer that the ABFC was aware of the risks associated with the alleged Omnicare scheme. *Price v. Strianese*, No. 17-CV-652 (VEC), 2017 WL 4466614, at *3 (S.D.N.Y. Oct. 4, 2017) (plaintiffs failed to allege that defendants knew or should have known that the stock fund was an imprudent investment where, in the absence of "allegations regarding the content of the . . . ethics complaint," the court

"cannot plausibly infer that Defendants knew or should have known about the accounting fraud").

For the same reason, Plaintiffs have failed to allege that the CVS Doe Defendants were aware of, and failed to act on, Omnicare's prescription roll-over practices. The Amended Complaint alleges that CVS Does 1-10 "include members of the CVS Benefits Plan Committee and Sub Committees who assumed administration of the Aetna Plan after the merger," Am. Compl. ¶ 36, but includes no allegations regarding these members' receipt of material, non-public information relating to Omnicare and the alleged prescription scheme, *Gearren*, 660 F.3d at 611 (dismissing fiduciary claim where plaintiffs "provide no basis" for conclusory allegations "that all of the defendants 'knew or should have known of the material misrepresentations' contained in the SEC filings").

Accordingly, Plaintiffs' duty of prudence claim against the ABFC, the Aetna Doe Defendants, and CVS Does 1-10 will be dismissed.

### C.  Count Two – Duty of Loyalty

ERISA requires fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and [ ] for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1). Fiduciaries "breach their duty of loyalty if they 'knowingly or intentionally mislead plan beneficiaries as to changes—whether effective or under consideration—to employee benefit plans.'" *In re DeRogatis*, 904 F.3d 174, 194 (2d Cir. 2018) (quoting *Bell v. Pfizer, Inc.*, 626 F.3d 66, 74 (2d Cir. 2010)).

Plaintiffs allege that the ABFC, Aetna Doe Defendants, and Mr. Bertolini breached their fiduciary duty of loyalty by "recommending to plan participants that they vote in favor of the

Merger," "allowing continued investments in the Aetna Common Stock Fund after the Merger Agreement was signed," "failing to mitigate plan assets out of the Aetna Common Stock Fund," "failing to eliminate the default divide reinvestment option to reduce continued investment into Aetna stock units," "failing to make adequate disclosures regarding risk of continued investment in [the] Aetna Common Stock Fund," and "failing to prevent prohibited transactions." Am. Compl. ¶ 161.

Plaintiffs' claim against Mr. Bertolini, as a non-fiduciary to the Plan, will be dismissed. As to the ABFC and Aetna Doe Defendants, Plaintiffs "plead[ ] no facts suggesting Defendant[s] benefitted, financially or otherwise, from any decisions related to the Plan[ ] or engaged in disloyal conduct in order to benefit [themselves] or someone other than the Plan['s] beneficiaries." *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 688 (D. Conn. 2018) (internal quotation marks and citation omitted). Plaintiffs allege that the ABFC and Aetna Doe Defendants "hoped to retain their positions" as employees following the merger, and that as a result of the merger, Aetna management and executives "enjoyed accelerated vesting of deferred compensation and other benefits," Am. Compl. ¶ 162, but in the absence of more detailed allegations, Plaintiffs have not alleged a conflict of interest or that "Defendants acted against the interests of Plan participants," *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 479 (S.D.N.Y. 2005) (conflict-of-interest claim that is "based purely on the fact that Defendants' compensation was stock-based" fails to state a claim for breach of fiduciary duty); *see also Twombly*, 550 U.S. at 570 (recognizing that the complaint must have "enough facts to state a claim to relief that is plausible on its face.")

Accordingly, Plaintiffs' fiduciary duty of loyalty claim will be dismissed.

**D.  Count Eight – Co-Fiduciary Liability**

ERISA § 405(a) imposes liability on a fiduciary to an employee benefit plan who, in addition to liability the fiduciary may have under any other provision, (1) "participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;" (2) "by his failure to comply with section 404(a)(1) . . . in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;" or (3) "has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. § 1105(a).

Plaintiffs assert a claim of co-fiduciary liability against "each fiduciary" under ERISA § 405(a). Am. Compl. (Count Eight) (emphasis omitted). To the extent this claim is brought against CVS, Aetna, and all individual Defendants, Plaintiffs have failed to allege that the Defendants are fiduciaries to the Plan with respect to the Plan's investments and disclosures in the Proxy and Registration Statement. Moreover, Plaintiffs do not include any allegations from which the Court may reasonably infer that the Defendants "knew of each [alleged] breach of fiduciary duty by the other fiduciaries" as required to establish a co-fiduciary claim. *Id.* ¶ 214; *In re Nokia ERISA Litig.*, No. 10-cv-03306, 2011 WL7310321, at *6 (S.D.N.Y. Sept. 6, 2011) (dismissing co-fiduciary liability claim where "[n]o specific factual allegations are made to support Plaintiffs' conclusory claim").

Accordingly, Count Eight will be dismissed.

### E.  Count Nine – Knowing Participation in Breach of ERISA

ERISA § 502(a)(3) "provides for 'appropriate equitable relief' to redress ERISA violations." *Demopoulos v. Anchor Tank Lines, LLC*, 117 F. Supp. 3d 499, 512 (S.D.N.Y. 2015 (quoting 29 U.S.C. § 1132(a)(3)). "While ERISA § 502(a)(3) provides a vehicle for seeking

equitable relief, in order to bring a claim [under] this Section, a plaintiff must also allege an underlying violation of some substantive provision of ERISA." *Miller v. Int'l Paper Co.*, No. 12 Civ. 7071 (LAK), 2013 WL 3833038, at *4 (S.D.N.Y. July 24, 2013); *Demopoulos*, 117 F. Supp. at 512–13 (ERISA § 502(a)(3) "does not provide equitable relief 'at large' but only for the purpose of redressing ERISA violations." (emphasis omitted) (quoting *Peacock v. Thomas*, 516 U.S. 349, 353 (1996))); *Gates v. United Health Grp, Inc.*, No. 11 CIV 3487, 2012 WL 2953050, at *11 (S.D.N.Y. July 16, 2012) ("[The fact] that . . . under Section 502(a)(3), plaintiff is entitled to pursue equitable relief against any defendant for violation of ERISA does not relieve her from having to establish an underlying violation of the statute." (internal citation omitted)).

Plaintiffs seek equitable relief under ERISA § 502(a)(3) against CVS and the individual CVS defendants as non-fiduciaries, arguing that even if the CVS Defendants are not fiduciaries to the Plan, they "can be held liable if they knowingly participated in the fiduciary breaches or violations of any fiduciary of the Plan." Am. Compl. ¶ 218. Plaintiffs claim that the CVS Defendants are liable as non-fiduciaries because they knowingly participated in fiduciaries' breach of their duties under ERISA § 404, as well as prohibited transactions under ERISA § 406. *Id.* ¶¶ 219–220.

Defendants argue that this claim must be dismissed because Plaintiffs have not pleaded an underlying breach of fiduciary duty. Defs.' Mot. at 38.

The Court agrees.

All of the Amended Complaint's causes of action are premised on Plaintiffs' claim that the Defendants committed a breach of fiduciary duty under ERISA § 404 or engaged in a prohibited transaction under ERISA § 406. For the reasons discussed above, Plaintiffs have not stated a breach of fiduciary duty or prohibited transaction claim.

Accordingly, because a claim for equitable relief under § 502(a)(3) must be based on an underlying violation, Plaintiffs' claim for equitable relief will be dismissed. *Metro. Life Ins. Co. v. Sicoli & Massaro Inc. Pension Trust*, 15 Civ. 7141 (PGG), 2016 WL 5390899, at *8 (S.D.N.Y. Sept. 26, 2016) (dismissing ERISA § 502(a)(3) claim because "Plaintiff's claims for breach of fiduciary duty fail to state a claim under Federal Rule of Civil Procedure 12(b)(6)").

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**.

If Plaintiffs wish to seek leave to file another amended complaint addressing the legal deficiencies described above, they must do so by October 29, 2021.

SO ORDERED at Bridgeport, Connecticut, this 30th day of September, 2021.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE