IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| RAYMOND RADCLIFFE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>AETNA, INC., CVS HEALTH CORPORATION, AETNA BENEFITS FINANCE COMMITTEE, CVS BENEFITS COMMITTEE AND SUBCOMMITTEES, LARRY J. MERLO, MARK T. BERTOLINI, EVA C. BORATTO, AETNA DOES 1-10 and CVS DOES 1-10,<br><br>Defendants. | Civil Action No.:  3:20-cv-01274-VAB<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| CAROL FLAIM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>AETNA, INC., CVS HEALTH CORPORATION, AETNA BENEFITS FINANCE COMMITTEE, CVS BENEFITS COMMITTEE AND SUBCOMMITTEES, LARRY J. MERLO, MARK T. BERTOLINI, EVA C. BORATTO, AETNA DOES 1-10 and CVS DOES 1-10,<br><br>Defendants. | Civil Action No.:  3:20-cv-01321-VAB |

Plaintiffs Carol Flaim and Raymond Radcliffe, (collectively "Plaintiffs") individually and on behalf of all others similarly situated, bring this action by and through their undersigned attorneys based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through

Plaintiffs' attorneys, which included, *inter alia*, a review filings with of U.S. Department of Labor ("DOL") and U.S. Securities and Exchange Commission ("SEC") by Aetna, Inc. ("Aetna"), and CVS Health Corporation ("CVS"), stock market analyst's reports; media reports about Aetna and/or CVS; previously filed class action pleadings alleging securities law violations regarding disclosures concerning the merger of Aetna and CVS; and a False Claim Act claim brought by the United States and twenty-nine states against Omnicare, Inc. for illegal dispensation of drugs by Omnicare/CVS pharmacies over the period from 2011-2018 (the "Illegal Prescription Scheme"). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.

## NATURE OF THE ACTION

1.     Plaintiffs bring this action on behalf of the Plan and individually, on behalf of a class of all current and former participants in Aetna 401(k) Plan (which was not transitioned into the CVS Health Future Fund 401(k) Plan until January 1, 2020), from  December 3, 2017 to February 20, 2019 (the "Class Period"), who held or acquired Aetna stock units in their Aetna 401(k) accounts beginning on December 3, 2017 through February 20, 2019 and/or who held or acquired CVS shares/units in their Aetna 401(k) on or after November 28, 2018 through February 20, 2019 (the "Class Period").  Aetna 401(k) Plan is referred to here as the "Plan."

2.     The claims asserted herein are brought on behalf of The Plan and plan participants (class members) under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001, *et seq*. ("ERISA"), against the Defendants, as defined below, for violations of ERISA's fiduciary duties and/or as to certain defendants for engaging in prohibited transactions. ERISA 29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.  If any Defendants were not

fiduciaries during any part of the Class Period, then any such Defendants are liable under ERISA to class members and/or the Plan in the alternative as knowing participants in the fiduciary breaches alleged herein.

3.     Plaintiffs allege in Counts I, II and III that the Defendants named in those counts had discretion and/or exercised same with respect to the administration and/or management of the Plan and/or its assets and breached their fiduciary duties to prudently and loyally manage the Plan and/or its assets.  In Count IV, Plaintiffs allege that the Defendants named therein engaged in fiduciary communications with the Plan and/or Plan participants, and/or had a duty to do so, but failed to provide the Plan and/or Plan participants with complete, truthful and accurate information regarding the risk of investing in Aetna stock units after Aetna and CVS signed the Merger Agreement on December 3, 2017 and regarding the risk of investing in CVS stock after November 28, 2018.  In Counts V and VI, Plaintiffs charge Defendants Aetna and CVS with engaging in non-exempt prohibited transactions (*i.e.* exchanging plan assets for CVS stock) allowing CVS to profit therefrom to the detriment of the Plan and/or plan participants.  In Count VII, Plaintiff allege that Defendants named in that Count who were responsible for the selection, removal, and, thus, monitoring of the Plan's fiduciaries, failed properly to monitor the performance of their fiduciary appointees and remove and replace those whose performance did not meet the standards for fiduciary conduct under ERISA.  In Count VIII, Plaintiffs allege that Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring.  In Count IX, Plaintiffs plead alternative claims against any Defendants not found to be fiduciaries, for non-fiduciary liability under ERISA for knowing participation in the fiduciary breaches alleged herein.  In Count X, Plaintiff allege that the CVS Defendants who

became fiduciaries to the Aetna Plan after the Merger breached their fiduciary duties from that time through the end of the Class Period.

4.      On December 3, 2017, the beginning of the Class Period, CVS and Aetna announced that they had signed a merger agreement pursuant to which Aetna shareholders would receive a combination of cash and CVS stock for each share of Aetna stock.  It was contemplated that the Aetna Stock Plan 401K participant's Aetna stock units (not actual stock shares) would be exchanged one-for-one into CVS stock units (not shares) upon closing of the merger.

5.      After the merger agreement was signed, predictably, Aetna's share price traded in tandem with CVS' stock price.  Since analysts were overwhelmingly positive about CVS' acquisition of Aetna and were unaware of (a) the Illegal Prescription Scheme and (b) the deterioration in CVS' Omnicare business and its value, CVS stock price climbed throughout 2018 and became increasingly artificially inflated, pulling Aetna stock up with it.  The CVS stock component of the merger consideration tied Aetna's stock price to CVS' stock price and meant that Aetna 401(k) plan participants who were acquiring and holding Aetna stock units in the Plan after the merger was announced were acquiring such units at prices driven by CVS' stock market price.

6.      Unbeknownst to the investing public or the Aetna's 401(k) participants who were invested in Aetna stock units, in 2017 and 2018 CVS was facing profound risks to its operations which were not fully disclosed to, nor appreciated by the investing public.  As a result, CVS stock traded above its true value and the Plan was therefore overpaying for Aetna stock units.  Later, as a result of the merger, CVS received valuable Aetna shares and/or units from the Plan in exchange for artificially inflated CVS stock and/or units.

7.      The undisclosed problems that inflated CVS stock price stemmed mainly from CVS' acquisition of Omnicare in 2015.  CVS had been touting the potential boost to its earning from the Omnicare operations since that acquisition.  Reported results at Omnicare had been inflated by revenues earned in the Illegal Prescription Scheme.  For pleading purposes CVS' participation and knowledge in the Illegal Prescription Scheme is a foregone conclusion in light of Chief Judge Collen McMahon's March 19, 2021 denial of CVS' motion to dismiss in *United States of America ex rel. Uri Assan v. Omnicare, Inc.*, 15-cv-04179-CM, ECF No. 89 which found, *inter alia*, "the government specifically alleged CVS' involvement in the scheme after it took over Omnicare's operation and compliance." *Id.* at 28.  A copy of that decision is annexed hereto as Exhibit A.  Moreover, shortly after the Omnicare acquisition it became apparent to CVS that the Omnicare acquisition would not contribute to CVS in anywhere near the predicted levels of accretive earnings.  In fact, in 2016, the CVS' "Retail/LTC" business segment, which included the Omnicare business, lost two huge pharmacy contracts causing CVS' stock price to drop more than 20%.  Despite subsequent acquisitions in the same space, the deterioration of CVS' Retail/LTC business, specifically the Omnicare business, continued apace through 2017 and 2018.  This deterioration presented material risks to CVS' financial condition, operating performance and stock price and thus the Aetna stock units.  The deterioration of this set of discrete assets at CVS was obvious to persons with access to CVS internal books records.  That group would have included the Defendants herein. Furthermore, Defendants knew that revenues derived from the Illegal Prescription Scheme were inflating CVS reported results and were not sustainable.

8.      Both ERISA regulations and SEC regulations required that information about CVS, the merger and its stock be provided to plan participants prior to Aetna stock unit holders' vote on the merger and receipt of CVS stock units.

9.     Plan Participants were provided with a "Joint Proxy Prospectus" to solicit their votes in favor of the Merger which included most if not all of the contents of the Registration Statement on Form S-4 that was declared effective on February 9, 2018 (the operative Form S-4 Registration Statement and its amendments, hereinafter the "Registration Statement," as well as defendants' joint proxy statement/prospectus on Form 424B3 filed with the SEC on February 9, 2018 (the "Proxy-Prospectus"), (collectively sometimes referred to herein as the "Offering Documents").  Both CVS and Aetna were responsible for preparation of the Offering Documents. The Offering Documents were provided to plan participants as part of fiduciaries' responsibility to provide information to participants about the quality and risks of investment alternatives and the vote for which they were being solicited.   As such those documents were fiduciary communications.   The Registration Statement was signed by, *inter alia*, the CVS officers and directors named as Defendants herein.

10.     Before the Offering Documents were issued to the Plan and its participants in February 2018 and before the Aetna shareholders (and Aetna unitholders in the 401(K) plan) voted in March 2018 to approve the Acquisition, there was more than a substantial risk that the Illegal Prescription Scheme would be expose and sanctioned and the deterioration of CVS' Retail/LTC business would adversely affect CVS and/or would have to be written down and/or should have already been written down, in a material amount as evidenced by numerous factors: (i) the steadily declining Omnicare business; (ii) CVS' efforts to hastily acquire LTC pharmacies throughout 2017 to obscure the deterioration in CVS Omnicare business and (iii) the almost immediate elimination of headcount at its acquired companies to boost cash flow, despite signs that such moves were causing the loss of major customers.

6

11.    The Offering Documents contained materially false and/or misleading statements about CVS' operations and financial condition.  The true condition of CVS and its true results could not be discerned by the reader because CVS financial statements were not in compliance with Generally Accepted Accounting Principles ("GAAP").  In particular, CVS falsely represented in the Offering Documents provided to the Plan and its participants that it had properly accounted for its $6+ billion goodwill asset, as reported in the "LTC unit" associated with CVS' 2015 acquisition of long-term care ("LTC") pharmacies of Omnicare, Inc. ("Omnicare").  All fiduciaries knew or should have known of the material risk presented to the Plan and/or plan participants.

12.    After the Merger agreement was signed and publicly announced, the artificial inflation in CVS stock price drove up/dragged up Aetna's stock price from approximately $176 per share in December 2017 to approximately $200 per share by early March 2018.

13.    When Aetna shareholders voted to approve the merger as recommended by Aetna's Board of Directors in a Proxy-Prospectus provided to class members in connection with their ownership of Aetna stock units in the retirement accounts, the Proxy-Prospectus failed to disclose to plan participants the risk presented to plan participants invested in Aetna stock units by CVS' asset value deterioration and the problems at CVS' Omnicare business.  The Joint Proxy-Prospectus constituted a fiduciary communication to plan participants concerning a major asset in participants' accounts in Aetna stock units.

14.    On March 13, 2018, Aetna shareholders approved the merger (including the provisions whereby Aetna plan participants' Aetna units would be exchanged for CVS units).

15.    Despite factors indicating a material risk deterioration in CVS' value due to probable impairment of goodwill in CVS' LTC unit, and exposure and sanctioning of the Illegal Prescription Scheme, none of the fiduciaries took any action to protect Plan assets or participants

or issue any disclosure that would have alerted participants to the material risk of future losses when the extent of the impairment of CVS assets became publicly known, even though the securities laws required such disclosure.

16.     Since the Plan's holdings in Aetna stock units comprised a significant percentage of the overall value of the assets the Plan held on behalf of its beneficiaries after the merger was approved, the long-term retirement savings of Plaintiffs and members of the Class were dependent, to a substantial degree, on the performance of CVS common stock.  So, too, were their retirement fortunes dependent upon the related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of Plan assets.

17.     The undisclosed risks were apparent to insiders well before the merger closed.  CVS and Aetna knew of the United States Department of Justice investigation into the Illegal Prescription Scheme and the potential intervention  into existing qui-tam suits since at least 2017 In the quarter following the Aetna shareholder vote approving the Merger, CVS took a $3.9 billion impairment charge to its assets most of which was attributable to the poor performance of the Omnicare business.  CVS waited however until August 2018, to disclose that *"we're clearly disappointed with our performance in the Omnicare business"* and that since the third quarter of 2017 CVS had been *"closely monitoring the performance of the [Omnicare] business for potential indicators of impairment."*

18.     However, the full extent of CVS' Omnicare deterioration in value was still to be publicly disclosed.  No information was provided to plan participants to explain the risk that the foregoing presented to their investment in Aetna stock units.

19.     On November 28, 2018, the defendants announced that the Merger had formally closed, with Aetna shareholders receiving cash and CVS stock units valued at $80 per share in exchange for their Aetna stock.  At that time, the Aetna 401(k) Plan became the CVS 401(k) Plan.

20.     In late February 2019, CVS announced a second multi-billion-dollar impairment charge to its Omnicare-related goodwill, this time a $2.2 billion impairment to be recognized in the fourth quarter of 2018 ended December 31, 2018.  CVS cited *"operational challenges"* as a basis for this second massive charge.  Because it had been only six months since the previous $3.9 billion impairment charge, these "operational challenges" were unlikely the result of recent developments, and were far more likely evidence of challenges existing much earlier in time, including in February 2018 when CVS was "closely monitoring" Omnicare operations and the Offering Documents were issued to investors, including Aetna shareholders.

21.     As a shocked and dismayed market digested this second round of Omnicare-related bad news, the price of CVS shares slid to the mid-$50s.  For example, from February 20, 2019, through late 2019 CVS's share value had declined over 13% relative to healthcare-related funds XLV (Health Care Select Sector SPDR Fund) and VHT (Vanguard Healthcare ETF).  This caused substantial loss and damage to Plan assets and participants accounts' who had/were invested in Aetna stock units.

22.     Defendants failed to inform Plan participants that material public statements about CVS's businesses, current and future financial prospects and results were materially incomplete and misleading, and/or failed to warn of specific known risks.  Since such disclosures were required by the strict liability provisions of Sections 11 and 12 of the Securities Act of 1933, fiduciaries could have and should have made corrective disclosures and/or made meaningful disclosures of the risks of investing in Aetna stock units.

23.     Defendants breached their fiduciary duties owed to the Plan and its participants and beneficiaries under ERISA by, among other things:

(a)     Selecting and maintaining Aetna stock units as an investment alternative for Participant contributions under the Plan after the merger was announced when it was no longer a suitable or prudent Plan investment option;

(b)     Encouraging Aetna employees to invest in Aetna stock units in advance of the merger;

(c)     Failing to divest the Plan from units in Aetna stock after the merger was announced when continuing to hold that investment option became imprudent as a result of the undisclosed material information of adverse financial and operating performance at CVS throughout 2017 and 2018 and the risks presented to plan participants of investments in Aetna stock units.

(d)     Failing to provide accurate, material information to enable Plan participants to make informed investment decisions concerning their contributions invested in Aetna stock units;

(e)     Allowing and/or participating in non-exempt prohibited transactions;

(f)     Failing to diversify participants out of CVS stock units after the merger; and

(g)     Abdicating their continuing duty to review, evaluate and monitor the suitability of the Plan's investment in Aetna stock units after the merger was announced.

24.     As a result of Defendants' breaches of their fiduciary duties, the Plan and/or its participants and beneficiaries, have suffered substantial losses of retirement savings and

anticipated retirement income from the Plan.  As such, under ERISA, Defendants are obligated to restore to the Plan and/or Plaintiffs and the classes the losses that resulted from their breaches of their fiduciary duties and restore to the Plan any profits made by the fiduciaries or the persons and/or entities who knowingly participated in the fiduciaries' imprudent and disloyal use of Plan assets and/or prohibited transactions.  In addition, Plaintiffs seek such other equitable or remedial relief as the Court may deem appropriate.

## II.

## JURISDICTION AND VENUE

25.     Plaintiffs bring this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan and/or participants to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

27.     Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan is administered in Hartford, Connecticut, many violations of ERISA took place in this District, and/or multiple defendants may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) because multiple defendants reside and/or do business in this District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.

## PARTIES

### A.     Plaintiffs

28.     Plaintiffs Carol Flaim and Raymond Radcliffe were participants in the Plan who invested in the Aetna Stock Fund during the Class Period and whose Aetna stock units were converted into CVS stock units as a result of the merger.  .  Plaintiffs have suffered financial harm and have been injured by Defendants 'unlawful conduct as described herein.

### B.     Defendants

29.     Defendant Aetna is a Delaware corporation and is now a wholly owned subsidiary of CVS.  Prior to the Merger, it was the sponsor of the Plan within the meaning of ERISA §3(16) (B), 29 U.S.C. §1002(16)(B).  After the Merger, the Aetna Plan was continued until January 1, 2020 when it was merged into the CVS Healthcare, Inc. 401(k) Plan(the "CVS Plan").

30.     Defendant CVS is a Delaware corporation. After the Merger, CVS became the owner of 100% of Aetna stock and the Aetna stock units in the Aetna Plan were exchanged for CVS stock units and cash.

31.     The "Plan Administrators" during the Class Period were employees and agents of their respective employers Aetna and/or CVS at all relevant times.  Accordingly, CVS and/or Aetna have vicarious liability for the fiduciary breach of their respective employees.  After Aetna's acquisition by CVS, Aetna employee Kay Mooney was replaced as "Plan Administrator" by CVS employee, Candace Jodice.  As the employer of the Plan's administrators, Aetna, and later CVS, had indirect discretionary powers and used their discretion to control, manage, and administer the Plan, its designated investment options and Plan assets.

32.     Defendants CVS and Aetna were also each "parties-in-interest" under ERISA with respect to the exchange of Aetna stock units in the Plan for CVS stock units in connection with the

Merger.  As such each is liable to the Plan for losses incurred by the Plan arising out the "prohibited transaction" in question and CVS is also liable to the Plan to disgorge any profits earned by CVS as a result of the "prohibited transaction."

33.     Defendant Aetna Benefits Finance Committee ("ABFC") and together with each of its members (Defendants Aetna Does 1-10) from the inception of the Class Period up to their replacement by other fiduciaries,  were fiduciaries of the Plan.  According to the Plan's latest Form 5500, ABFC "oversees the appropriateness of the Plan's investment offerings and monitors investment performance."  Accordingly, its members had, and  most likely exercised,  fiduciary discretion over plan administration and management of assets and the Plan.

34.     Defendants CVS Does 1-10 were the fiduciaries of the Aetna 401K Stock Plan from November 28, 2018 through February 20, 2019, the end of the Class Period.  CVS Does 1-10, include, members of the CVS Benefits Plan Committee and Sub Committees identified below who assumed administration of the Aetna Plan after the merger.

35.     The CVS Plan designated "committees" as "named fiduciaries."  The three committees were:

> The Benefits Plans Committee appointed by CVS Board of Directors and consists of CVS Board Members.
>
> The Benefits Plan Administrative Subcommittee is responsible for the administration of the Plan, including establishing rules for administration of the Plan and construing and interpreting the Plan and is both "Plan Administrator" and administrator within the meaning of Section 3(16)(A) of ERISA the BPC is responsible for the appointment of members of the Administrator Subcommittee.
>
> The Benefit Plans Investment Subcommittee is responsible for the management and control of the assets of the Plan; its members are appointed by the BPC.
>
> The Investment Subcommittee could in its discretion appoint investment managers within the meaning of Section 3(38) of ERISA

to manage, acquire, dispose of assets of The Plan, including the
ESOP, as the Employer shall designate.

36.     Defendant Larry J. Merlo ("Merlo") was the Chief Executive of CVS who signed

the Registration Statement which included the materially false and misleading Joint Proxy-

Prospectus which was used to solicit the vote of Aetna Plan Participants who were invested in

Aetna stock units.  Merlo had control and responsibility for the preparation and contents of CVS'

Registration Statement and Joint Proxy-Prospectus which constituted fiduciary communications

to the Plan and Class Members.

37.     Defendant Eva C. Borratto was CVS' EVP and CFO from November 2018 to the

present and prior thereto was CVS' EVP – Controller and Chief Accounting Officer and in such

capacity was a signatory to the Registration Statement.  Borratto had responsibility for the

preparation and contents of CVS' Registration Statement and Joint Proxy-Prospectus which

constituted fiduciary communications to the Plan and Class Members.

38.     Defendant Mark T. Bertolini ("Bertolini") was Chairman CEO of Aetna until the

close of the merger on November 28, 2018 and drafted some of the fiduciary communications

described herein concerning Plan investment in Aetna stock units.

**C.     The Plan**

39.     Nominal Defendant, the Aetna 401(K) Plan (*i.e.*, the Plan), is, and at all relevant

times, has been an "employee pension benefit plan" within the meaning of ERISA §3(2)(A),

29 U.S.C. §1002(2)(A), and a "defined contribution plan" or "individual account plan" within the

meaning of ERISA §3(34), 29 U.S.C. §1002(34).  The Plan is named as a nominal defendant

pursuant to Fed. R. Civ. P. 19 to ensure that complete relief can be granted as to claims brought

on behalf of the Plan.

40.     The Plan, a participant-directed defined contribution plan, is a voluntary savings plan that provides retirement income to eligible employees who are U.S. employees, employed by Aetna Inc. (the Company) or a participating subsidiary company.  The Company includes a qualified automatic contribution arrangement in the Plan. New and rehired employees are automatically enrolled in the Plan at a 3% pretax contribution rate unless the employee chooses a different rate or opts out of participation. Auto-enrolled participants will have the automatic rate escalator feature enabled, which will automatically increase the pretax contribution rate by 1% each year to a maximum of 10% of eligible pay.  Employees may elect to contribute 1% to 40% of their eligible pay on a pretax basis and/or on an after-tax basis as a Roth 401(k) contribution. Participants who are not highly compensated employees may also contribute 1% to 5% of their eligible pay on an after‑tax basis as a traditional (non-Roth account) contribution.  Participants are immediately eligible to receive a 100% employer company match contribution on the first 6% of eligible pay contributed to the Plan on a combined pretax and Roth 401(k) basis. The matching contributions are made in cash and invested according to each participant's investment elections.

41.     Participants may direct their investment contributions and employer contributions among twenty-two investment options offered by the Plan among which was the Aetna Common Stock Fund (and later converted to units in the CVS Health Common Stock Fund).

42.     The portion of the Plan invested in the Aetna Common Stock Fund and later CVS Health Common Stock Fund is designated as an employee stock ownership plan (ESOP). Under the ESOP, a participant can elect to receive, in cash, dividends that are paid on stock in the Stock Fund or else reinvest dividends in the Stock Fund. If no election was made, by the participants, their dividends were automatically re-invested in the Stock Fund.

43.     Even with respect to the Stock Fund, which was designated as an ESOP, the fiduciaries of the Plan and/or the Stock Fund are subject to the same fiduciary duties, responsibilities, obligations and potential liability as other fiduciaries, except with respect to the duty to diversify (which does not apply to ESOPs by virtue of a special statutory exemption, 29 U.S.C. Sec. 1104(a)(2)).

44.     The Plan's investment in Aetna stock units was a material portion of the Plan's assets. As of December 31, 2017, the Plan's investment in Aetna common stock units was calculated at market price, $1,144,635,702.00, up from $866,271,483.00 at the end of 2016.  In the same period, participants' investments in Aetna units went from 11.8% of total plan assets in 2016 to 13.6% of plan assets.  From 2016 to 2017 the dollar amount of Aetna stock units in the Plan jumped 32.1% even as total plan assets grew only approximately 14%.  On the last trading day of 2017, Aetna stock traded at approximately $183 per share up from $124.01 on the last day of trading in 2016.

45.     While the Aetna Plan did not transition to the CVS Plan until January 1, 2020, the Aetna stock units converted to CVS stock units at the time of the merger and the CVS plan fiduciaries replaced the Aetna plan fiduciaries at the same time.

## IV.

## DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

A.    **Fiduciary Status**

46.     Under ERISA Section 102(21)(A), (i) and (iii) a "fiduciary" is defined as:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or control respecting management or disposition of its assets . . .; (ii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

16

47.     The CVS Defendants were fiduciaries of the CVS Plan at all relevant times.  First CVS was a fiduciary to Aetna Plan Participants before the merger because Aetna Plan Participants were "participants" "who may become eligible" to receive benefits of the CVS Plan.  One of the investment alternatives in the CVS Plan was CVS stock units, accordingly, CVS had a fiduciary duty to disclose both pre-merger and post-merger to Aetna plan participants details of known risks facing participants whose Aetna stock units would automatically by CVS actions convert to CVS stock units in the Aetna Plan post-merger.

48.     Second, according to both the Investment Policy Statement for the Aetna 401(K) Stock Plan (revised December 2017) and the Investment Policy Statement for the Aetna 401(K) Stock Plan (revised December 2018), at Appendix G page 20 under the Section entitled "Additional Marketing and Control" states, *inter alia*, "fiduciaries of the [Stock Fund] Trust will be responsible for overseeing the investment of plan assets in company stock according to Plan documents, and for determining whether company stock has become an imprudent investment for the Plan."  See Exhibits B and C.

49.     The IPS provides that the Executive Vice President, Human Resources Vice President, Pension Investments and the BFC (of both Aetna (pre-merger) and CVS (post-Merger) will have fiduciary responsibilities.  Both versions of the IPS impose fiduciary duties of prudence and loyalty upon "BFC members" and Plan's staff, investment managers, . . . administrators and others who exercise discretionary control over the management or disposition of the Trust assets. Under each IPS, the Chairman of Aetna and CVS respectively were "granted authority and responsibility with respect to the Plan."  IPS page 2.  Such authority and responsibility endowed each Chairman of Aetna and CVS (pre and post-merger, respectively) with fiduciary duties to oversee the Plan, monitor other fiduciaries and determine the imprudence or not of the Stock Fund.

50.     Third, the Plan for the Aetna 401(K) Plan Amended And Restated January 1, 2014 allocated fiduciary responsibilities to the Plan Administrator (*i.e.* Aetna or CVS) (page 87 *et seq*.) as a named fiduciary.   Each of CVS and Aetna also returned for themselves "the duty to periodically review the performance of the [BFC] and Trustee on an annual basis.   As Plan Administrator pursuant to Plan Article XIII, 13.1(a) and (b), CVS and Aetna respectively had "sole responsibility" for the Plan <u>except</u> for duties assigned to the BFC.   BFC's duties were set forth in Article V, 5.7 and specifically <u>excluded</u> any duties for BFC with respect to the stock fund at issue herein.

51.     Accordingly, the Defendants named herein had fiduciary responsibilities and exercised same during the Class Period as set forth in governing Plan documents.

**B.      Duty of Loyalty**

52.     ERISA imposes strict duties of loyalty upon fiduciaries of the Plan.   ERISA §404(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and –
> (A)     for the exclusive purpose of:
>
>> (i)      providing benefits to participants and their
>>          beneficiaries.

53.     The duty of loyalty requires fiduciaries to act with an "'eye single'" to the interests of plan participants.   *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).   "'Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons.'"   *Id.* at 224.

54.     According to the DOL, the "primary responsibility of fiduciaries is to run the plan *solely* in the interest of participants and beneficiaries and for the exclusive purpose of providing

18

benefits and paying plan expenses" (emphasis added).  In addition, ERISA fiduciaries "must avoid conflicts of interest" and "may not engage in transactions on behalf of the plan that benefit parties related to the plan, such as other fiduciaries, services providers or the plan sponsor."  Thus, the duty of loyalty prohibits fiduciaries from acting in service of their own interests or those of a third party to the detriment of plan participants.

## C.    Duty of Prudence

55.    ERISA "'imposes a "prudent person" standard by which to measure fiduciaries' investment decisions and disposition of assets.'"  *Fifth Third Bancorp v. Dudenhoeffer*, __ U.S. __, 134 S. Ct. 2459, 2467 (2014) (citation omitted).  This means that ERISA fiduciaries must discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use."  29 U.S.C. §1104(a)(1)(B).

56.    To meet the prudent process requirement, fiduciaries must vigorously and thoroughly investigate the investment options to obtain relevant information and then base their decisions on the information obtained.  "A fiduciary must engage in an objective, thorough, and analytical process that involves consideration of the quality of . . . investment products, as appropriate."  72 Fed. Reg. 60453 (October 24, 2007) (Preamble).

## D.    Duty To Monitor Other Fiduciaries

57.    Under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments."  *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).  If an investment is imprudent, the plan fiduciary "'must dispose of it within a reasonable time.'"  *Id.* (citation omitted).

**E.     Fiduciary Disclosure Duties**

58.     Under ERISA, the Plan Administrator here Aetna and/or CVS is responsible for

complying with ERISA disclosure requirements.  29 CFR 2550.404 a-5, Fed. Reg. Vol 75, No.

202, Oct. 20, 2010; Rules and Regulations.

59.     The DOL has taken the position, endorsed by the United States Supreme Court in

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) that:

> . . . with regard to ERISA's general fiduciary standards, as noted in
> the preamble to the proposal, 73 FR 43014, n.8, it should be noted
> that there may be extraordinary situations when fiduciaries will
> have a disclosure obligation beyond those addressed by the final
> rule.  For example, if a fiduciary knew that due to a fraud,
> information contained in a financial report would mislead investors
> concerning the value of a designated investment alternative, the
> fiduciary would have an obligation to take appropriate steps to
> protect the plan's participants such as disclosing the information or
> preventing additional investments in the alternative plan until the
> relevant information is made public.  75 FR 64922, n. 17.

**F.     Co-Fiduciary Liability**

60.     ERISA also imposes explicit co-fiduciary liability on plan fiduciaries.  29 U.S.C.

§1105(a) provides for fiduciary liability for a co-fiduciary's breach: "In addition to any liability

which he may have under any other provision of this part, a fiduciary with respect to a plan shall

be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan

in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to

conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific

responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to

commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes

reasonable efforts under the circumstances to remedy the breach."

**G.     Duty To Avoid Prohibited Transactions**

61.     In addition to the duties of loyalty and prudence imposed by ERISA §404, certain transactions are expressly prohibited by ERISA §406, and are considered *per se* violations of ERISA because they entail a high potential for abuse.  Fiduciaries are required to avoid engaging in prohibited transactions.  Violations of "prohibited transaction" rules lead to strict liability imposed upon violators and/or beneficiaries of the prohibited transactions and are not subject to any "prudence" analysis at either the pleading or proof stage.

**H.     Liability Of A Non-Fiduciary For Knowing Participation**
**        In Fiduciary Breaches And/Or Prohibited Transactions**

62.     Non-fiduciaries may be liable for losses to a plan, or its participants and beneficiaries, if such non-fiduciary knowingly participates in fiduciary breaches and prohibited transactions.

**V.**

**SUBSTANTIVE ALLEGATIONS**

**A.     Aetna**

63.     When it was independent, prior to the Merger, Aetna was a diversified health benefits company whose health insurance products and services included medical, pharmacy, dental, behavioral health, group life and disability plans, and health benefits management and administrative services.  In 2015, Aetna agreed to a merger with Humana, a seller of medical and specialty insurance product which would have allowed Humana members to access the type of healthcare services provided by Aetna.  The merger was abandoned in 2017 by both parties after a court enjoined the merger on anti-trust grounds. Thereafter, Aetna continued as an independent company and enjoyed robust financial results and paid its stockholders a steadily increasing

dividend.  But Aetna continued to look for a merger partner through which it could increase outlets to offer its products and services.  Eventually Aetna and CVS found each other.

**B.     CVS**

**1.     Overview of CVS**

64.     CVS and its subsidiaries comprise the largest integrated pharmacy health care provider in the United States based upon revenues and prescriptions filled.  It has three self-described business segments: "Pharmacy Services," "Retail/LTC" and "Corporate."

65.     Within CVS' Retail/LTC segment is the LTC unit (aka, "Long-Term Care unit"), largely comprising the former business of Omnicare which CVS acquired on August 18, 2015. Omnicare is/was a provider of pharmaceuticals and related pharmacy services to LTC facilities (*e.g.,* assisted living, skilled nursing, and senior centers) and a provider of specialty pharmacy and commercialization services for the bio-pharmaceutical industry.

66.     When CVS acquired Omnicare it paid $9.6 billion and assumed long-term debt with a fair value of approximately $3.1 billion.  At acquisition, CVS estimated that the fair value of the Omnicare assets it acquired included $9.1 billion of goodwill that CVS allocated entirely to its Retail/LTC segment.  CVS promoted the Omnicare acquisition as a key move to expanding CVS's business throughout multiple markets related to pharmaceutical care.  The press release stated in part:

> CVS Health expects to achieve significant purchasing and revenue synergies as well as operating efficiencies from this combination.  The company expects  the transaction to be approximately 20 cents accretive to Adjusted EPS in 2016, its first full year, excluding integration and any one-time transaction costs. It is expected to become increasingly accretive to Adjusted EPS in subsequent years.  CVS Health expects that it will continue to have a solid balance sheet and, with its strong free cash flow, is committed to returning to its targeted leverage ratio of 2.7 times adjusted debt-to EBITDA.

67.     Here, Omnicare had assets valued at approximately $6 billion and liabilities totaling $5.4 billion, leaving a net book value of $600 million.  The $9.6 billion purchase price resulted in $9 billion in goodwill, which represented more than 94% of the purchase price.  This meant that, post-acquisition, the carrying value of Omnicare on CVS's balance sheet consisted almost entirely of the intangible assets related to Omnicare on CVS's balance sheet consisted almost entirely of the intangible assets related to Omnicare's existing customer base and reputation in the long-term care market, as well as the synergies created by combing Omnicare with CVS.  That intangible value was precisely what Defendants highlighted to investors as justifying the premium CVS paid for Omnicare.

68.     Because CVS merged the Omnicare Long-Term Care business into its Retail segment to create the Retail/LTC segment, the Company largely allocated the Omnicare goodwill to its Retail/LTC segment.  In the Form 10-Q for the third quarter of 2015, CVS reported that "[g]oodwill of $8.6 billion was allocated to the Retail/LTC Segment and the remaining goodwill of $0.4 billion was allocated to the Pharmacy Services Segment."  Of that $8.6 billion, $6.4 billion was allocated to the Omnicare Long-Term Care reporting unit, and it is that goodwill that is at issue in this case (defined above as the "Omnicare goodwill").

### 2.     The Illegal Prescription Scheme

69.     Since 2015, several whistleblower claims under the False Claims Act ("FCA") were filed in the United States District Court of the Southern District of New York.  After several years of investigation, including subpoenas and other investigative inquires to Omnicare while it was owned by CVS, the United States on December 17, 2019, filed a civil fraud healthcare lawsuit against Omnicare and CVS.  The FCA claims alleged that CVS fraudulently billed federal healthcare programs for hundreds of thousands of non-controlled prescription drugs dispensed on

stale, invalid prescriptions to elderly and disabled individuals.  The lawsuit alleges that Omnicare failed to obtain new prescriptions from patients doctors after the old ones had expired or run out of refills and instead just assigned a new number to the old prescription.  Omnicare referred to these prescriptions internally as "rollover" prescriptions.

70.    The FCA complaint alleged that this conduct continued from 2010 through 2018 and was actively overseen by CVS after its acquisition of Omnicare.

71.    According to the Complaint in Intervention of the United States of America filed December 17, 2019 (SDNY 15-civ-4179), even before the DOJ started investigating CVS and Omnicare, several states had conducted investigations including New Mexico's board of Pharmacy (2015), Utah's Division of Occupational and Professional Licensing (2012),, Missouri's Board of Pharmacy (2014), and Ohio's Board of Pharmacy (2014).

72.    The scope of Omnicare's rollover prescription scheme was vast, encompassing patients in more than 3,000 residential long term care facilities over an eight year period.

73.    CVS's Omnicare unit booked a material amount of ill-gotten revenue by engaging in what the United States Department of Justice and numerous state attorneys general have described as illegal "rollover" prescription and billing practices.  After prescriptions expired or refills were exhausted, Omnicare continued to dispense medication and ill the federal government of it, instead of obtaining new prescriptions as it was required to do.  Those illegal practices were material in scope.  The rollover practices systematically impacted Omnicare's assisted living facilities, which represented 24% of Omnicare' prescription volume as of January 2017.  In their complaint against CVS and Omnicare , the Department of Justice alleged that those illegal rollovers affected at least 3,200 residential facilities that the Long-Term business serviced.  Audits conducted by CVS after it acquired Omnicare revealed that illegally billed prescriptions often

24

approached or exceeded 50% of all prescriptions filled at Omnicare.  Moreover, the Department of Justice has alleged that, shortly after CVS agreed to acquire Omnicare in May 2015, CVS managers learned of the illegal rollover practices, yet failed to take timely corrective action, and did not end the practice until 2018.

74.     There was insufficient public disclosure of the effect on CVS of the gradual ending of the Illegal Prescription Scheme and its effect on CVS' business and valuation during 2018 as a result of the False Claims lawsuits.  That information was held among insiders at Aetna some of whom, especially Aetna itself were fiduciaries of the Plan.

### 3.     Omnicare's Deteriorating Business

75.     After acquisition the Omnicare business almost immediately went awry for CVS. In 2016, CVS lost two huge pharmacy contracts to Walgreens Boots Alliance causing CVS stock to drop 20%.  One contract, with Tricare, was a contract serving 9.4 million members of active duty and retired military.  It was lost.  In addition, according to former employees cited in the complaint in *In Re CVS Health Corporation Securities Act Litigation*, (D.R.I.) 19-cv-00434 ECF 27 pages 35-37, in 2016-2017 Omnicare also lost business of Brookdale Senior Living Inc., the U.S.A. largest long term care provider; Life Core Centers of America, USA's largest privately held eldercare company and Genesis Health Care, one of America's largest post-acute care providers.

76.     In early 2017, CVS was experiencing factors indicating that its Omnicare-related goodwill asset was impaired or at substantial risk of experiencing an impairment write down. Those factors and the impairment resulting therefrom, or the potential for impairment, were thus known to CVS and were apparent from its records and were or could have been discerned by the Aetna fiduciaries named herein during the course of Aetna's due diligence of CVS.

77.     Ahead of the Aetna merger, CVS' acquisitions masked the deteriorating value of CVS assets from investors.  By early 2017, CVS knew internally that the Omnicare integration was off track and that Omnicare was performing badly and was expected to continue its poor performance into future periods.  As CVS was steadily losing LTC market share in 2017, CVS responded to these negative factors (indicating probable impairment of the LTC goodwill asset) by targeting LTC pharmacies for acquisition with the main purpose being to prop up the existing LTC unit's business prospects and/or mask the risk of material goodwill impairment of that segment's assets.  CVS sought to delay a write off that would materially adversely affect its earnings, financial condition and stock market value at a time when CVS was seeking to make other acquisitions using its stock as currency.

78.     In early 2017, CVS Omnicare agreed to pay $47 million to acquire ModernHealth, a large Southern California LTC pharmacy services business which serviced 150 LTC facilities, employed 140 people, and had over 10,000 beds under pharmacy supply contracts, generating over $70 million in sales annually.  According to a November 2018 lawsuit filed by Modern Health, shortly after closing of that deal, in the third quarter of 2017, all but 25 people at Modern Health were terminated by CVS/Omnicare, indicating CVS's intent to acquire the LTC pharmacy only as a pretext for projecting huge cost savings and increasing cash flows from thousands of new beds under contract.  CVS' strategy backfired.  With only a skeleton crew providing customer support, however, the LTC pharmacy customers fled the new Omnicare-acquired LTC pharmacy.  Within the first year (i.e.. early 2017 to early 2018), all but 6 of the original 150 LTC facilities (formerly serviced by ModernHealth) had terminated their contracts with Omnicare and the LTC beds under contract fell from over 10,000 to only 507.  A similar backfire occurred with respect to CVS' acquisition of Pharmore Drugs, (the largest independently owned LTC pharmacy in Illinois,

located just outside Chicago) in late 2017.  Immediately after that acquisition closed, CVS filed WARN notices in Illinois required due to CVS' plan to engage in massive layoffs at Pharmore effective November 30, 2017.

79.     CVS business model for its LTC/Retail business revealed why CVS could expect to experience asset value impairment in its LTC segment.  CVS continued to lose more business: A 2017 study found it charged companies $200 million more for drugs than it reimbursed to pharmacists, thus raising questions as to whether corporate customers were being exploited.

80.     In late 2017, analyst Speights again reported on CVS' woes:  continued reimbursement pressure at its retail/LTC business had afflicted CVS throughout CVS' first three fiscal quarters of 2017 and had been cited by CVS as a cause for CVS' 17% year over year net income decline in Q-1 2017.  Net income declines lead to reduced cash flows which inevitably lead to impaired asset value.

81.     An adoption by CVS of a new accounting standard ensured the asset impairment issues would have to receive executive level and board level attention at CVS.  After CVS' acquisition of Omnicare, CVS adopted Accounting Standards Update No. 2017-04 ("ASU 2017-04"), called *Simplifying the Test for Goodwill Impairment* commencing January 1, 2017. Compliance with ASU 2017-04 required CVS to test goodwill including specifically the Omnicare goodwill for impairment at least annually (CVS selected the third quarter for mandatory testing) and was required to test goodwill for impairment during the interim periods *(i.e.,* first, second or fourth quarters) if CVS experienced factors indicating that the goodwill asset was more likely than not impaired.  If either the annual or interim tests indicated that the goodwill asset was probably (>50% likelihood) impaired, CVS was required to conduct quantitative tests to determine the extent of the impairment.  Thus, prior to the merger vote, CVS had conducted, and documented at

least one goodwill impairment test, in the third quarter of 2017, and CVS conducted another mandatory goodwill impairment testing in the third quarter of 2018 (*i.e.*, June 30, 2018 to September 30, 2018).

82.     Although the declining LTC business triggered CVS' hasty acquisitions of LTC pharmacies beginning in early 2017, the failing ModernHealth transaction indicated poor LTC prospects, and CVS failed to make the necessary disclosures.  By failing to timely disclose and properly report the material risk of the likelihood and/or amounts of the LTC unit's impaired or potentially impaired goodwill, CVS's share price was artificially inflated, and thus presented a material risk to the participants' 401(k) account values as their Aetna stock unit's value tracked CVS stock price.

83.     The impairment tests which were conducted, even though flawed, showed a clear trend of the material declines of the "fair value" to "carrying value" spread of CVS' goodwill and other assets from 2016 through 2017 and through 2018 as reflected in CVS financial statements quoted in part herein.  The results of these tests would have alerted a prudent fiduciary to the material risk to which Aetna stock units were exposed.  However, this analysis was not apparent to, or brought to the attention of class members.

## C.     The Start Of The Class Period

84.     In mid-2017, Aetna began discussions with CVS to explore whether a combination of Aetna and CVS could be agreed whereby CVS, the larger of the two companies, would in effect take over Aetna and absorb it into CVS.  During the discussion and negotiation period prior to signing of the Merger Agreement, Aetna had access to an electronic data room containing non-public financial, legal and other information about CVS.  In addition, Aetna's financial advisors

and Aetna management met with CVS representatives and financial advisors to discuss the financial information.

85.     On December 3, 2017, CVS and Aetna announced the execution of a definitive merger agreement pursuant to which Aetna shareholders would receive $145.00 per share in cash and 0.8378 shares of CVS common stock for each share of Aetna stock.  The transaction valued Aetna at approximately $207 per share or $77 billion, including $8 billion in net debt.  Based on the number of shares of CVS Health common stock outstanding as of February 5, 2018, and the number of Aetna common shares outstanding as of February 5, 2018, immediately following completion of the merger, CVS Health stockholders were expected to own approximately 78% of the outstanding shares of post-merger CVS Health common stock and former Aetna shareholders were expected to own approximately 22% of the outstanding shares of post-merger CVS Health common stock.

86.     On December 1, 2017, the last trading day before the Merger Agreement was announced Aetna was trading at approximately $177 per share.  Aetna's stock price very soon increased to meet the implied value of CVS Merger consideration.  The fact that CVS was by far the larger of the two companies, and that CVS had a more diverse group of revenue producing assets and that the rationale for the merger was for Aetna's operations to be absorbed and integrated into CVS meant that going forward the value of Aetna stock units in the Plan would be tied to CVS stock price.  Concomitantly, any risks to standalone CVS' operations, financial condition and stock price presented the same risk to Aetna's stock (and thus the Aetna stock units in the Plan value from the date the agreement to merge was announced through the date of the Merger).

**D.     The Information Provided To Plan Participants After The
         Merger Agreement Was Signed Failed To Adequately
         Warn Of The Risks Of Investment In The Aetna Stock Fund
         Presented By The Merger**

87.     On January 26, 2018, Aetna issued a "Q&A" on proposed transaction with CVS Health whose context indicated it was prepared for and distributed to Aetna employees.  In that Q&A, Aetna addressed current Aetna employees "benefits," and the Exchange Stock Purchase Plan and described CVS' seven major lines of business including "Pharmacy Benefits Management;" "Retail Pharmacy;" and "Long Term Care Pharmacy."  However, Aetna failed to disclose or warn of risks to participants presented to Aetna and/or CVS from the Illegal Prescription Scheme or its slow winding down in 2017-2018.

88.     During the Class Period, Aetna made numerous communications to its employees including plan participants which were filed with the SEC as Form 425s.  These communications were <u>not</u> required to be made under any securities regulations or rules but if made, then either CVS or Aetna could file same.  Aetna also held several "all-employee town hall meetings" during the Class Period.  At those meetings, Aetna executives discussed CVS and Aetna and the combination of the two without disclosing risks to CVS and Aetna from the Illegal Prescription Scheme or its slow winding down in 2017-2018.

89.     On January 4, 2018, CVS filed a preliminary Registration Statement on Form S-4 with the SEC for the issuance of CVS shares to be exchanged for Aetna stock in the Merger.  The Registration Statement was declared effective by the SEC on February 9, 2018. At or about the same time, Aetna provided plan participants with the Joint Proxy Prospectus which included the substantive portions of the Registration Statement to solicit plan participants vote in favor of approval of the merger and to provide to plan participants information about the CVS stock units

they would receive for their Aetna stock units in their 401(k).  The Proxy Statement/Prospectus provided to plan participants was prepared jointly by CVS and Aetna.

90.     ERISA mandates that Plan fiduciaries provide information to plan participants about the risks of investments offered in the Plan.

91.     ERISA regulations and Department of Labor ("DOL") rules require that the voting rights to the common stock underlying the common stock units the Stock fund owned by Plaintiffs and plan participants be passed through to the participants who own the units.

92.     Furthermore, in order to maintain its status as a "tax credit employee stock ownership plan" under Internal Revenue Code 409, the Plan must allow "each participant or beneficiary in the plan . . . to direct the plan as to the manner in which securities of the employer which are entitled to vote and are allocated to the account of such participant or beneficiary are to be voted."  *Id*. at 409(e)(1), (2).

93.     As a result of the foregoing regulations and the fact that participants in the Stock Fund are owners of "units," not stock, the voting rights to vote for or against the merger were an incident of their rights under the Plan and Stock Fund, not an incident of rights of stock ownership. Accordingly, their rights to receive the communications in the Proxy were incidents of their rights under the Plan and Stock Fund.

94.     Plaintiffs and class members had a right to receive information informing their "pass-through" right to voting, under ERISA, equivalent to what is/was provided to actual Aetna stock owners in proxies.  *See* 29 CFR 2550.404(c)1(d)(2)(ii)(E)(4)(iv).

95.     Since the plan participants' right to receive information about the merger was an incident of their status was participants in the Stock Fund, the proxy materials were therefore ERISA-mandated communications to Plaintiffs and class members.

96.     Notwithstanding the pass-through voting feature of the Stock Fun and regardless of whether the fiduciaries are otherwise entitled to any Section 404(c) protection, such protection is not available as to any fiduciaries employed by the employer (i.e. Aetna and later CVS) because of the presence of "employer influence" on the voting of the merger in the form of the recommendations to Plan Participants invested in the Stock Fund to vote in favor of the merger.

97.     The Offering Documents stated that CVS's and Aetna's respective Boards of Directors had approved the proposed Acquisition, unanimously determined that the proposed Acquisition was advisable, fair to, and in the best interests of each company's stockholders, and recommended that each company's stockholders vote for "FOR" approval of the Acquisition. These were intended to be, and were, communications to plan participants and were intended to aid Plaintiffs and class members in the exercise of voting rights accorded to them by terms of the Plan in which they were participants.

98.     Aetna Defendants were aware of or had access to information indicating the Illegal Prescription Scheme and the material deterioration of CVS's Omnicare business.  Both CVS and Aetna covenanted, in the Merger Agreement, to keep each other informed of each other's operations and financial condition.  In addition, in the Merger Agreement, Aetna agreed to refrain from certain business activities without CVS approval, thus giving a measure of control over Aetna and with that control an accompanying fiduciary power and responsibility.

99.     The Offering Documents expressly incorporated by reference several SEC filings, including CVS's Annual Report on Form 10-K for the fiscal year ended December 31, 2016; CVS's quarterly reports on Form 10-Q for the fiscal quarters ended March 31, 2017, June 30, 2017, and September 30, 2017; and CVS's Proxy Statement on Schedule 14A filed on March 31, 2017.  The Registration Statement also expressly incorporated by reference all Form 10-Ks and 10-Qs filed

'"between the date of [the Registration Statement] and the respective dates of the Aetna and CVS

... special meetings," which were held on March 13, 2018.  As such, CVS's Annual Report, filed

with the SEC on Form 10-K on February 14, 2018, was also expressly incorporated by reference

into the Registration Statement.

100.    These documents failed to provide plan participants with truthful, accurate and

complete information about material risks to CVS financial condition and results of operations,

specifically as to the LTC operations which included Omnicare and the Illegal Prescription

Scheme.

101.    The Offering Documents expressly stated that an impairment analysis had been

performed during the fiscal year ended December 31, 2016, that CVS was then carrying

approximately $38.2 billion in goodwill, approximately $6.4 billion of which was attributable to

the 2015 acquisition of Omnicare, stating, in pertinent part, as follows:

> Goodwill and Intangible Assets
>
> . . . .
>
> Goodwill represents the excess of amounts paid for acquisitions
> over the fair value of the net identifiable assets acquired.
>
> *     *     *
>
> *Goodwill and indefinitely-lived intangible assets are subject  to
> annual impairment reviews, or more frequent  reviews if events or
> circumstances indicate that the carrying value may not be
> recoverable.*
>
> *     *     *
>
> *The carrying value of goodwill and other intangible assets covered
> by this critical accounting policy was* $38.2 *billion* and $13.5 billion
> *as of December* 31, *2016,* respectively. We did not record any
> impairment losses related to goodwill or other intangible assets
> during 2016, 2015 or 2014. *During the third quarter of2016, we
> performed our required annual impairment tests of goodwill and
> indefinitely lived trademarks.* The goodwill impairment tests
> resulted in the fair values of our Pharmacy Services and Retail

Pharmacy reporting units exceeding their carrying values by significant margins. *The fair values of our LTC and RxCrossroads reporting units exceeded their carrying values by* 7% *and* 12%, *respectively. The balance of goodwill for our LTC and RxCrossroads reporting units at December 31,2016 was approximately* $6.4 *billion* and $0.6 billion, respectively.

[Emphasis supplied].

102.    Just a week after the Offering Documents were filed, on February 14, 2018, CVS filed its Form 10-K for the fiscal year ended December 31, 2017, which contained representations similar to those in the 2016 Form 10-K and was also expressly incorporated into the Offering Documents:

> Our acquisition of Omnicare broadened our base of pharmacy care to an additional dispensing channel, long-term care pharmacy. Omnicare's LTC operations include the distribution of pharmaceuticals, related pharmacy consulting and other ancillary services to chronic care facilities and other care settings. Omnicare also provided commercialization services under the name RxCrossroads until January 2, 2018, when we completed the sale of RxCrossroads.  LTC is comprised of 145spoke pharmacies that primarily handle new prescription orders, of which 30 are also hub pharmacies that use automation to support spoke pharmacies with refill prescriptions. LTC primarily operates under the Omnicare® and NeighborCare® names. *With the addition of the LTC operations, we are continuing to enhance our service offerings to further address the needs of an aging population throughout the continuum of senior care.*

[Emphasis supplied].

103.    As to the value of the goodwill then being carried on CVS' s books from the Omnicare acquisition, which would be added to and carried on CVS's books in connection with the Acquisition, the Offering Documents expressly stated that an impairment analysis had been performed during the fiscal year ended December 31, 2017, that CVS was then  carrying approximately $38.5 billion in goodwill, approximately $6.5 billion of which was attributable to the 2015 acquisition of Omnicare,  stating, in pertinent part, as follows:

Goodwill and Intangible Assets

*       *       *

*Goodwill and indefinitely-lived intangible assets are subject to annual impairment reviews, or more frequent reviews if events or circumstances indicate that the carrying value may not be recoverable.*

*       *       *

*The carrying value of goodwill and other intangible assets covered by this critical accounting policy was* $38.5 *billion* and $13.5 billion *as of December 31, 2017,* respectively.  We recorded $181 million in goodwill impairments in 2017 related to our RxCrossroads reporting unit, see Note 3 "Goodwill and Other Intangibles" to our consolidated financial statements. We did not record any impairment losses related to goodwill or other intangible assets during 2016 or 2015.  *During the third quarter of 2017, we performed our required annual impairment tests of goodwill and indefinitely-lived trademarks.* The goodwill impairment tests resulted in the fair values of our Pharmacy Services and Retail Pharmacy reporting units exceeding their carrying values by significant margins. *The fair values of our LTC* and RxC *reporting units exceeded their carrying values by approximately* 1% *and* 6%, *respectively.   The balance of goodwill for our LTC and RxCrossroads reporting units at December 31, 2017 was approximately* $6.5 *billion* and $0.4 billion, respectively. On January 2, 2018, we sold our RxCrossroads reporting unit to McKesson Corporation for $725 million.

[emphasis supplied].

104.    In CVS's third quarter 2017 Form 10-Q, incorporated into the Offering Materials provided to participants CVS stated:  "The fair values of our LTC and Retail reporting units exceeded their carrying values by approximately  1% and 6%, respectively."

105.    While plan participants could not readily understand the significance of the decline in the excess of "fair value" of LTC's goodwill over its "carrying value" from December 31, 2016 to September 30, 2017, Defendants knew and understood that the decline was due to material deterioration in LTC's operations and cash flow which was materially eroding the value of the

business.   Moreover, plan participants knew nothing of the Illegal Prescription Scheme.   The fiduciary Defendants thus knew, or had constructive knowledge of, the imprudence of continued investment in Aetna Stock units whose value was tied to CVS stock and knew that the risks presented to the Plan and Plan Participants by continued investment in Aetna stock units after the merger was announced were not properly disclosed.

106.   The Offering Materials failed to disclose risk of investing in Aetna stock units due to CVS's Illegal Prescription Scheme and the LTC unit's faltering performance because Omnicare had not been successful in preserving its existing businesses, nor able to realize the "synergies" and operating "efficiencies" promoted earlier.   Moreover, the predicted *"expected costs savings"* were not from "labor productivity" and other initiatives but rather based on wholesale reductions of personnel that only exacerbated service and quality issues at Omnicare and contributed to further deteriorations in value.

107.   The disclosure of significant write-downs by CVS may have made the Aetna acquisition prohibitively expensive.   Part of the transaction consideration was a stock-for-stock exchange.   Aetna's shareholders were to receive 0.8378 CVS shares for each Aetna share, based on the volume-weighted average price for the five consecutive trading days ending December 1, 2017 of $74.21 per CVS share.   Had CVS reported significant write-downs and its stock price declined prior to the vote, the exchange ratio or cash component for the Aetna acquisition would have had to be adjusted to pay out more consideration to Aetna shareholders.

108.   As further set forth herein, the Offering Documents made a number of positive statements about CVS's Long-Term Carebusiness and Omnicare goodwill.   In general, the Offering Documents represented that:

a.      CVS's Long-Term Care business was healthy and financially stable;

b.      CVS's Omnicare goodwill was not impaired;

c.      CVS's financial reporting complied with U.S. Generally Accepted Accounting Principles; and

d.      There was no material negative trend occurring in the Long-Term Care business.

109.    For instance, in the Company's 2017 Annual Report on Form 10-K, which was incorporated into the Offering Documents, CVS stated that the Omnicare goodwill was not impaired and did not need to be written down.  CVS stated that "[t]he fair value of our LTC . . . reporting unit[] exceeded [its] carrying value[] by 1%," "[t]he balance of goodwill for our LTC . . . reporting unit[] at December 31, 2017 was approximately $6.5 billion," and CVS believed it had "sufficient current and historical information available to us to test for impairment."

110.    The Offering Documents also stated that Omnicare was a driver of the Company's financial success.  For example, in the Company's 2016 Annual Report on Form 10-K, which was also incorporated into the Offering Documents, CVS stated that for its Retail/LTC Segment, "[n]et revenues increased approximately $9.1 billion, or 12.6%, to $81.1 billion for the year ended December 31, 2016, as compared to the prior year. . . . primarily driven by," among other things, "the acquisition of Omnicare's LTC operations."

111.    In additional communications to investors in the lead up to the Aetna acquisition, Defendants continued to represent the Long-Term Care business as a reliable growth driver.  For example, on January 4, 2018, Defendants held the "CVS Health 2018 Guidance Call" with securities analysts, during which Defendant Denton stated that the Company "expect[ed] solid script growth driven by new initiatives tailored toward assisted living facilities and benefits from acquisition activity.  As a result, for the entire Retail/Long-Term Care segment, we expect revenue growth of 2.5% to 4%. . . .All in, we expect operating profit growth again in the low single digits."

112.    On June 1, 2015, 29 states and the District of Columbia, alongside relator (and former Omnicare pharmacist Uri Bassan) sued Omnicare in a qui tam action for violating the Federal False Claims Act, and state and local false claims acts, by seeking reimbursement for drugs illegally delivered to patients in Omnicare's assisted living and skilled nursing facility clients. Heretofore identified as the Illegal Prescription Scheme.  On December 13, 2019, the original complaint was unsealed, and four days later, on December 17, 2019, the Department of Justice intervened in the matter on behalf of the United States and filed its complaint (the "Bassan complaint") under the False Claims Act.

113.    Omnicare's rollover practice (and its impact on the performance of the Long-Term Care business) was substantial and occurred in numerous states.  According to the *Bassan* complaint, those illegal rollovers affected at least 3,200 residential facilities that Omnicare/CVS serviced.  The *Bassan* complaint includes attachments listing 1,256 assisted living and other residential facilities across 33 different states and Washington, D.C. that had those illegal rollovers through OmniDX; 510 unskilled residential facilities across 15 different states that had illegal rollovers through Oasis; and 1,476 assisted living facilities that received illegal rollovers through the cycle fill system on OmniDX.  Those lists were provided by Omnicare to the government.

114.    As the *Bassan* complaint details, the practice was long-lasting and exposed Omnicare to financial risks for many years.  Indeed, in 2012, Omnicare paid $50 million to settle Department of Justice claims that Omnicare's pharmacies had dispensed controlled substances to long-term care patients across the country without proper prescriptions.  The Bassan complaint also lists eight other lawsuits and government investigations under the False Claims Act for unlawful pharmacy practices (some broader than the illegal rollover practices) that resulted in major fines, totaling $337,270,000 in settlements that Omnicare paid between 2006 and 2017.

115.     Omnicare's compliance team was aware of the magnitude and risk posed by the rollover issue as early as 2012, according to the *Bassan* complaint.  The *Bassan* complaint alleges that internal audits found that Omnicare pharmacies often lacked valid prescriptions to support drug dispensations.   For example, as detailed in the *Bassan* complaint, a 2012 draft report summarizing an Omnicare audit of pharmacy processes and controls in South Carolina reported a "recurring issue" identified in multiple operational audits that year: "Renewal physician orders are not consistently obtained due to the lack of an automated process to prevent the pharmacy from dispensing an order beyond 12 months." That draft report was circulated to several compliance officers, including Omnicare's Chief Compliance Officer, who did not correct the problem.  The *Bassan* complaint details similar internal audit reports with the same findings in Pennsylvania in 2012 and 2013, the results of which were forwarded by Omnicare's Chief Audit Officer to the Chief Compliance Officer.

116.     Further, as the *Bassan* complaint alleges, shortly after CVS agreed to acquire Omnicare in May 2015, CVS managers became aware that Omnicare pharmacies were "rolling over" prescriptions without valid authorization.   CVS assumed control over Omnicare's Operations and Compliance departments, overseeing Omnicare pharmacy dispensing practices, policies, and systems. CVS was notified that Omnicare pharmacies were dispensing drugs to residents of assisted living facilities and other residential facilities without valid prescriptions.

117.     The *Bassan* complaint also alleges that, in 2017, CVS conducted an audit of Omnicare's revenue process, which identified instances where the signed cycle fill authorization form had not been obtained by pharmacies.  As a result of that audit, CVS's Chief Audit Executive directed management to "design and implement a monitoring program to assess pharmacy compliance with required refill authorizations."

118.     Despite the severity of the issue and the information available to CVS about it, the *Bassan* complaint alleges that CVS did not begin to take appropriate corrective actions until CVS became aware of the government's investigation (after the Omnicare acquisition).  In late 2015 and into 2016, the CVS finally revised its OmniDX drug tracking software to "turn off" rollovers at assisted living facilities, and significantly increased its oversight of OmniDX; in May 2016, Omnicare finally changed OmniDX to prevent cycle fill medications from rolling over for retirement facilities; and in December 2016, the CVS altered OmniDX to stop rollovers from being the default at unskilled facilities.

119.     But CVS did not reconfigure its other Omnicare prescription tracking software, Oasis, until early 2018.The fact that Oasis was still allowing illegal rollovers was known by CVS before the Offering Documents were issued and before the shareholder vote on the Aetna acquisition in March 2018.  The *Bassan* complaint alleges that in a September 2017 email, CVS's Senior Director of Internal Operations-Long-Term Caresent an internal email to an Information Technology Director that asked, "What will it take to repeat the process" of preventing assisted living facility rollovers for Oasis.  Moreover, in early 2018,Omnicare conducted a survey of all Oasis pharmacies to determine how often unskilled facilities were set  up correctly according to state regulations governing prescriptions for unskilled facilities.  A January 2018 email describing the internal review reported that "[a]udits have identified facility set up issues which are allowing orders to continue in perpetuity," according to allegations in the *Bassan* complaint.

120.     The illegal rollover practices at Omnicare and CVS represented a substantial part of the CVS' long-term care business.  The assisted living facilities throughout which the improper Medicare and Medicaid billing practices were endemic represented 24% of Omnicare's prescription volume as of January 2017.  The audits discussed above concluded that improperly

billed prescriptions often approached or exceeded 50% of all prescriptions filled.  Accordingly, the financial hit of correcting Omnicare's faulty prescription record-keeping systems was significant, in addition to the attendant regulatory and litigation exposure that CVS faced.  The material loss in income and financial exposure that CVS faced were additional red flags that demonstrated the Omnicare goodwill's significant impairment.

121.    The following undisclosed risks to the value of CVS stock and thus to the value of Aetna stock units in the Plan existed when the Offering Documents were provided to plan participants invested in Aetna stock units:

(a)    by the end of 2017, CVS' financial condition and expected earnings had deteriorated as a result of rising costs and poor results being experienced in the LTC unit associated with the 2015 acquisition of Omnicare;

(b)    in 2017, deteriorating conditions and prospects in CVS' LTC unit prompted CVS to undertake hasty acquisitions of LTC pharmacies to compensate for the declining LTC business and/or mask the expected LTC goodwill impairment ahead of the planned Acquisition;

(c)    although negative LTC performance factors prompted CVS and the CVS Individual Defendants to make hasty LTC pharmacy acquisitions in 2017, those same negative factors were being overlooked and ignored for purposes of undertaking, disclosing, and reporting the risks of write-downs to LTC goodwill  throughout 2017;

(d)    the LTC goodwill being carried on CVS' books as a result of the Omnicare acquisition was being carried at inflated values that would in the near future require billions of dollars in impairment charges that would be charged against earnings;

(e)    the Illegal Prescription Plan; and

(f)    as a result of the foregoing, CVS' true business metrics and financial

prospects were not as the Offering Documents represented and participants were not adequately informed of the risks of continued investment in Aetna stock after the merger agreement was signed.

122.     The Offering Documents were not just deficient by ERISA standards but also failed to comply with SEC disclosure regulations.   Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make an investment in ...  the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." The Offering Documents' failure to disclose the facts identified above violated Item 303 because these undisclosed facts, which were known to CVS and Aetna management, would (and did) have an unfavorable impact on the CVS' sales, revenues and income from continuing operations and the value of the goodwill being carried on its books. This failure also violated Item 105 of Regulation S-K, 17 C.F.R. §229.105, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors driving CVS stock price which was in turn driving Aetna's stock value in 2018 investment in CVS common stock speculative or risky.

**E.     The Defendant Fiduciaries Were Aware Of CVS' Illegal Prescription Scheme And Its Effects On CVS Value And The Risks Posed To Participants In The Plans**

123.     Defendants Melo and Bertolini were provided with information about CVS's "Illegal Prescription Scheme" as a result of the "integration" activities from the time the merger

agreement was signed through the merger date.  Aetna and CVS described the integration in

public documents as:

> Aetna Update – Integration Planning
>
> • Formal, tightly organized Integration Management Office
>   (IMO) established
>
>   - Report to Larry Merlo and Mark Bertolini, led by senior
>     executives from both companies
>
>   - Steering committee of executive management developed to
>     provide guidance and strategic direction to the IMO
>
>   - Two goals:
>
>     1. Ensure smooth transition, along with laying out path to
>        the expected $750 million synergies in the second full
>        year of operations
>
>     2. Create long-term roadmap for growth after close of
>        transaction
>
> • Twenty-two integration work streams developed, with
>   representation from both CVS and Aetna, focused on wide
>   range of objectives:
>
>   - How we will work together most efficiently
>
>   - Operational processes
>
>   - Capturing opportunities for growth and innovation
>
>   - Valuable progress has been made on identifying
>     components of $750 million synergy goal for second full
>     year of operation

*See* May 2, 2018 Form 425 filing by CVS "First Quarter 2018 Earnings Conference Call.  The

inference that Aetna's senior executives including Defendant Bertolini learned of CVS' Illegal

Prescription Scheme and the qui tam action and that CVS was winding down the Illegal Prescription Scheme in 2017-2018 and that the resultant loss in revenues had materially reduced CVS value and would require material write downs and losses.

124.    The integration teams met during the class period with over 100 members of the companies' management attending a meeting in Rhode Island where CVS is headquartered.

125.    Because the Omnicare Illegal Prescription Scheme was well known at CVS after CVS acquired Omnicare, and because of the huge volume of Omnicare's prescription volume represented by the Illegal Prescription Scheme and because drug prescription were the core of at least two of CVS' six main lines of business, ABFC individuals, several of whom were senior officers and management of Aetna knew, or had access to such information as a result of the communications between and among CVS and Aetna senior officers and management persons on the integration teams (described later herein) through 2018 up to the Merger.

**F.    After The Merger Vote, CVS Begins To Admit That Its Businesses Had Been Deteriorating Thus Putting Fiduciaries On Further Notice That Continuing Investments In Aetna Stock Fund Were Imprudent**

126.    On March 13, 2018, CVS and Aetna shareholders including plan participants investment in Aetna stock units approved the Acquisition.

127.    After the vote on the Merger, CVS admitted that it had waited until June 2018 (after the March 2018 shareholder vote) to finally update its LTC unit forecasts to reflect the sharply declining LTC business that CVS had been wrestling with since early 2017.  CVS revealed in August 2018 that its 2018 second quarter results (April 1, 2018 to June 30, 2018) reflected a $3.9 *billion charge* related to impaired goodwill for its LTC unit related to poor actual and projected Omnicare performance.

128.    Defendants knew or should have known of the material deterioration in Omnicare's business and the probability of a material write-down of assets because Aetna and CVS each had access to each other's "properties, books, contract, records and information concerning . . . businesses, properties and personnel" by virtue of provisions in the Merger Agreement. Defendants could have discovered these facts with the exercise of even minimal diligence.

129.    On November 28, 2018, the Acquisition was completed.  Under the terms of the merger agreement, each outstanding share of Aetna common stock was exchanged for $145.00 in cash and 0.8378 shares of CVS common stock.  In the Plan, Aetna units were exchanged for CVS units.  CVS common stock closed at $80.27 per share on November 28, 2018, the day the Acquisition closed.  In announcing the completion of the Acquisition, CVS which now owned Aetna announced that:

> Shareholders are expected to benefit from a number of outcomes, including enhanced competitive positioning; the delivery of more than $750 million in synergies in 2020; and a platform from which to accelerate growth. The roadmap for value creation over the longer term has the potential to deliver substantial incremental value through the development of products and services that provide the opportunity to generate significant new growth opportunities aimed at reducing medical costs, growing membership and enhancing revenues.

130.    On February 20, 2019, *less than 90 days after it had closed the massive Aetna acquisition,* CVS issued a press release announcing its fourth quarter and full year 2018 results and providing 2019 full year guidance.  The press release shocked investors with earnings guidance significantly lower than expected due, in large part, to rising costs and poor results related to CVS' acquisition of Omnicare.  In the release, CVS admitted that it had "continued to experience" materially rising costs and poor financial results during the fourth quarter of 2018 as a result of the Company's 2015 Omnicare acquisition, far beyond what CVS had budgeted for when it made the

Omnicare acquisition, due to, among other things, "lower occupancy rates in skilled nursing facilities, significant deterioration in the financial health of numerous skilled nursing facility customers which resulted in a number of customer bankruptcies in 2018, and continued facility reimbursement pressures."  As a result, in addition to the $3.9 billion impairment charge CVS had already taken on the LTC unit in the third quarter of 2018,  CVS was being forced to take another *$2.2 billion* impairment charge on the Omnicare goodwill for its fourth quarter of 2018, ended December 31, 2018, the quarter during which the Acquisition had been completed.

131.    That same day, *Fortune* published an article, entitled "CVS Stock Plummets as 2019 Looks Like It Will Be a 'Major Disappointment' for Investors," which stated in part:

> The company announced a $2.2 billion write down on its 2015 takeover of Omnicare, a $12.9 billion deal that was meant to build the company's business serving patients in nursing homes and long-term medical-care facilities.
>
> *            *            *
>
> The $2.2 billion Omnicare charge follows an earlier, $3.9 billion write down CVS took on the business in the second quarter. Together, they add up to half of what the company paid for Omnicare three years ago.  The unit is predicting more challenges in the future, CVS said.

132.    The article also quoted Evercore ISI analyst Ross Muken, who noted that not only was the February 20, 2019 press release's 2019 guidance a "'major disappointment,'" it would also "'stoke fears'" that CVS' $68 billion purchase of insurer Aetna the year before "'was defensive in nature.'"

133.    In response, various analysts lowered or downgraded CVS' stock, with Wells Fargo Securities, for example, concluding:

> •      We are downgrading CVS Health to Market Perform from Outperform, based on its continued failure to stabilize its existing businesses, particularly the LTC (Long-term care) business.  CVS has failed to improve operations after two years of pressure and continues to struggle

with its Omnicare LTC acquisition, setting up 2019 as a weaker than expected year. CVS expects the ongoing business pressures to have an outsized impact on 2019 ....

134.     And as a March 4, 2019 *Seeking Alpha* article, entitled "Good Will Hunting: CVS Health Decline Explained," later explained: "CVS realized that it was extremely over optimistic about the growth rates and profitability in its long term care division i.e., LTC. This does not come as a surprise to us as we have been documenting this drama within the senior housing and skilled nursing facilities space where challenges abound ....  "

135.     Six months after the close of the Merger, in 2019 CVS stock price was trading in the $60 per share range, far below the price of CVS shares during most of 2018.

## V.

## FIDUCIARY ACTIONS THAT
## COULD HAVE AND SHOULD HAVE BEEN TAKEN TO PROTECT PLAN ASSETS

136.     Throughout the Class Period, defendants knew or should have known the truth about these misleading statements and CVS' failures to disclose the truth about its Omnicare business. Defendants knew or should have known that CVS' stock price did not reflect material information about CVS and that this would inevitably adversely affect the Aetna Stock Fund and Plan Participants.  Yet defendants did nothing to act upon that knowledge to protect the retirement savings of the Plan participants to whom they owed their fiduciary duties.

137.     The Individual Defendants were in positions of power and authority and involvement in the merger and understood the risk to Plan assets from the fact that CVS was winding down the Illegal Prescription Scheme and revenues were declining permanently and as a result CVS value was thereby materially less than reported and the proper impairment and reporting with respect to the Omnicare business had not occurred as required by GAAP.

47

138.    The fiduciaries had several alternative actions they could have taken that would have been consistent with the securities laws which could not reasonably viewed as causing more harm than good, such as:

a)    Fiduciaries could have closed the Aetna Stock Fund to new purchases;

b)    Fiduciaries could have lowered the maximum limits of Aetna stock units which Plan Participants could hold either as a fixed number of units or a percentage of each participants' 401(K) account assets;

c)    The Plan could have offered Aetna Stock units to Plan Participants at a discount;

d)    Fiduciaries could have slowly mapped out participants from Aetna stock units;

e)    Fiduciaries could have had the Plan reprice units or cause Aetna to redeem the Aetna units in the Plan; and

f)    Fiduciaries could have issued more complete information and warnings concerning the condition of the CVS' Omnicare business and the risk of a material write down to CVS asset values in the future.

139.  A market correcting disclosure or a warning could have been made which would not have conflicted with securities laws requirements or objectives and in fact would have been consistent therewith.

140.  Disclosure of the truth to the public was necessary to correct the artificial inflation, and to prevent both present and future harm and damage to the Plan. Defendants' disclosure would have ended the artificial inflation in CVS' stock price, which was damaging all purchasers through the Plan who paid excessive prices for Aetna stock units.

141.  For example, if Defendants had tried to effectuate corrective public disclosure near the very beginning of the Class Period—almost all of the artificial inflation of Aetna's and CVS'

stock price that occurred could have been avoided. Such disclosure would not have harmed the participants who held Aetna units in their accounts at the start of the class period because the value of their purchases of units that occurred prior the class period would have likely only declined to the price of the stock BEFORE the Aetna units started to incorporate the CVS price inflation into the Aetna stock.. But as the artificial inflation went on and on, more and more Plan participants made purchases of Aetna stock units at artificially high prices, and thus the harm to Plan participants steadily increased. As two experts framed the issue:

> If the fraud occurs on one day at the beginning of the class period so that the gap between the value line and the price line appears immediately, the bias will be small because only investors who purchased the securities in the first few days of the class period are affected by the error. However, if the fraud consists of a series of omissions and misrepresentations so that the gap between the price line and the value line widens slowly, *the inflation will be overstated for a much larger group of purchasers*.

Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 911 (1990) (emphasis added).

142.    Defendants , who are ERISA fiduciaries also needed to act to prevent future harm and damage to the Plan's investment in Aetna units. This position was at risk from a large stock price correction when the public learned the truth. As time passed, CVS stock price inflated further making the eventual collapse worse. The concealment put the Plan's holding of Aetna units (and later CVS units) at risk for a serious and lasting decline in value, and hurt management's credibility and the long-term prospects of CVS as an investment.  This significant harm to the Plan could have been prevented or mitigated by timely disclosure.

143.    This reputational damage is not merely theoretical. Economists and finance experts have conducted numerous empirical studies on the matter, and concluded "the reputational

penalty" a company suffers because it perpetrates a prolonged concealment of the truth is significantly greater than any regulatory fines or other penalties that it may occur—in fact, the reputational penalty is "7.5 times the sum of all penalties imposed through the legal and regulatory system." Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, Journal of Financial and Quantitative Analysis, Vol. 43, No. 3 (Sept. 2008). Moreover, "*[f]or each dollar that a firm misleadingly inflates its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $3.08 …. [of which] $2.71 is due to lost reputation*." *See id.* (Emphasis added.) And this reputational damage, unsurprisingly, increases the longer the concealment goes one. *Id.*

144.    Defendants cannot argue that the federal securities laws prevented them from taking the actions identified above inasmuch as DOL guidance described herein specifically requires fiduciaries to take action to protect participants.

145.    Defendants could not have reasonably believed that effectuating truthful, corrective disclosure would do "more harm than good" to the Plan or its participants. First and foremost, the participation of the fiduciaries in the concealment of Omnicare's true value which deceives the Plan participants runs counter to ERISA's fundamental obligation that fiduciaries must communicate truthfully and accurately with those to whom a fiduciary duty is owed. At a minimum, defendants had the fiduciary obligation to disclose the truth to correct the artificial inflation.

146.    Disclosure of the material overstatement was inevitable because CVS' recoveries from the Illegal Prescription Scheme were ending, permanently, and the material decline would be obvious once the annual report was made and/or once the qui tam suit was unsealed.  Also, once CVS auditors started their annual audit in fall 2018 the auditors would understand that the decline

in revenues was permanent the impairment would have to be recognized and accounted for or else CVS' auditors could not certify that CVS' 2018 financial statement were presented fairly in accordance with Generally Accepted Accounting Principles.  The eventual CVS-Aetna merger closing the unsealing of qui tam action and the end of the revenue stream from the scheme were triggering events that made disclosure inevitable.

## CLASS ACTION ALLEGATIONS

147.    Plaintiffs brings this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows:

> All participants in the AETNA 401(k) Plan from December 3, 2017 through February 20, 2019 who were invested in the AETNA Stock Fund at any time from December 3 2017 through November 28, 2018 and whose units were converted to CVS common stock units as a result of the merger;;

> Excluded from the Class are (a) Defendants, (b) any fiduciaries of the Plan, (c) the officers, directors, and fiduciary committee members of AETNA and CVS during the Class Period, and (d) members of the immediate families and their legal representatives, heirs, successors or assigns of any such excluded party.

Rule 23 (a):

**Numerosity and Impracticability of Joinder**

148.    The members of the Class are so numerous that joinder of all members is impracticable.  Based on the most recent Form 5500 filed with the DOL in 2018, as of December 31, 2017, the Plan had over 20,000 participants.

**Commonality**

149.    The issues of liability are common to all members of the Class and can be established through common proof as those issues focus on Defendants' acts (or failures to act).

The common issues include whether the Plan fiduciaries breached various fiduciary duties to the Plan, whether certain Defendants engaged in prohibited transactions, whether the fiduciary defendants are liable for their co-fiduciaries breaches, whether Defendants whom are non-fiduciaries can be charged with non-fiduciary liability under ERISA for knowingly participating in these breaches and violations, whether the Plan and/ or the participants suffered losses as a result of the fiduciary breaches and other violations and what is the appropriate relief for Defendants ' violations of ERISA.

**Typicality**

150.    Plaintiffs' claims are typical of the claims of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class. Plaintiffs' claims challenge whether the fiduciaries of the Plan acted consistently with their fiduciary duties, whether they engaged in prohibited transactions, whether the non-fiduciaries knowingly participated in those breaches and violations and whether those breaches or violations caused losses or otherwise harmed the Plan and their participants or resulted in profits to those fiduciaries and non-fiduciaries.  These are claims common to, and typical of, other Class members and these claims seek recovery on behalf of the Plan.

**Adequacy**

151.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

152.    Plaintiffs have no interests that conflict with those of the Class.  Defendants do not have any unique defenses against the Plaintiffs that would interfere with her representation of the Class.

**Rule 23(b)(1)**

153.    The requirements of Rule 23(b)(1)(A) are satisfied in this case.  Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to uniformly act in the best interests of the Plan and their participants.  As this action challenges whether the Plan fiduciaries acted consistently with their fiduciary duties to the Plan, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct in the administration of the Plan.

154.    The requirements of Rule 23(b)(1)(B) are also satisfied in this case.  Administration of an ERISA plan requires that all similarly situated participants be treated consistently.  As such, whether Defendants fulfilled their fiduciary obligations with respect to the Plan and the Plan's participants in this action would, as a practical matter, be dispositive of the interests of the other members of the Class regardless of whether they are parties to the adjudication.

**Rule 23(b)(2)**

155.    Among the relief sought on behalf of the Class is a determination that the Plan fiduciaries breached their fiduciary duties (and that the non-fiduciaries knowingly participated in those breaches or violations), a determination of the amount by which those breaches adversely affected the Plan, and an order requiring Defendants to make good those losses to the Plan and restore any profits to the Plan.  Such relief is accomplished by issuance of a declaration or an injunction and therefore the primary requested relief constitutes final injunctive or declaratory on behalf the Class with respect to the Plan.

**Rule 23(b)(3)**

156.    A class can be certified under 23(b)(3) because common issues of fact and law predominate over individual issues and a class action is the superior  method for adjudication of

the claims asserted herein in light of the manageability of the class action claims and cohesion of the class.

## COUNT I

**Breach of Fiduciary Duties of Prudence in Violation of ERISA
§404(a)(1)(B) Against the Aetna BFC Defendants And Aetna
Does 1-10 and CVS Does 1-10 of the Post-Merger Plan ("Count I Defendants")**

157.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

158.    The "Count I Defendants" were fiduciaries of the Plan under ERISA §3(21), 29 U.S.C. §1002(21) and/or 1102(a)(1), during their respective tenures, as a result of (1) their responsibilities for, *inter alia*, management of the plan, investment options and plan assets and concerning the addition of new investment options or the suspension or divestiture of any existing investment options; (2) being named fiduciaries under the Plan; and/or (3) because they managed and/or disposed of Plan investment options, and were charged with taking action and/or making recommendations about the prudence of the Plan investments.

159.    As fiduciaries of the Plan, the Count I Defendants were required pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), to discharge their duties with respect to the Plan solely in the interests of the participants and beneficiaries, and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

160.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a Plan's assets are responsible for ensuring that investment options made available to Participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  Count I Defendants were responsible for ensuring that all investments in the Plan were prudent and that such

investments were consistent with the purpose of the Plan.  The Defendants named in this Count are thus liable for losses incurred as a result of investments in Aetna stock units and later in CVS stock unit being imprudent and for failure to diversify after the merger closed.

161.    According to Department of Labor ("DOL") regulations, a fiduciary's investment or investment course of action is prudent if: (i) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (ii) he has acted accordingly. 29 CFR 2550.404a-1.

162.    DOL regulations further specify that "appropriate consideration" in this context includes, but is not necessarily limited to:  A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action.

163.    Moreover, a fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives which it knows, or reasonably should know, would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

55

164.    ERISA's duty of prudence required the Aetna BFC and Aetna Doe Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary duties, they knew or should have known were relevant to the risks inherent in having plan assets invested in the Stock Fund  and to act accordingly.  *See* 29 C.F.R. §2550.404a1.  The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

165.    As described above, Aetna BFC and Aetna Doe Defendants failed to properly evaluate the prudence of the Plan's investments in AETNA after the merger agreement was signed. A prudent fiduciary, in possession of the information about the risks to the value of Aetna Stock units in class members accounts herein, would have taken steps to protect plan assets and removed the AETNA Stock Fund as an investment option in the Plan and/or migrated assets out of The Plan and/or closed it to new investments and/or terminated the dividend reinvestment option or other viable options described herein.

166.    Similarly, the CVS Doe Defendants 1-10 breached their fiduciary duties of prudence by failing to diversify out of CVS stock units and by allowing, after the merger closed, CVS stock units to constitute an investment alternative.

167.    Fiduciaries' reliance on the market price of Aetna stock (and after the merger CVS stock) was imprudent because Aetna's stock price after signing of the merger agreement was tied to CVS' stock price rather than to Aetna's value, and the risk that CVS stock price was inflated was too high for a prudent fiduciary to allow continued investment in Aetna stock units.

168.    Through these actions and omissions, Count I Defendants failed to discharge their duties with respect to the Plan:  to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B).

169.    As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Class suffered substantial losses than they would have otherwise experienced had the Aetna common stock Plan (later the CVS Common stock Fund Plan) been closed to new investment and/or divested.  The Count I Defendants are liable to the Plan and/or Class members for damages and/or appropriate equitable relief.

## COUNT II

### Breaches of Fiduciary Duties of Loyalty in Violation of ERISA §404(a)(1)(A), Against Aetna Benefit Finance Committee And Aetna Doe Defendants 1-10, And Defendant Bertolini ("Count II Defendants")

170.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

171.    As fiduciaries of the Plan, the Count II Defendants were required under ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A), to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of providing benefits to the participants and beneficiaries of the Plan; and (B) in accordance with the documents and instruments governing the Plan in so far as those documents are consistent with ERISA.

172.    The Count II Defendants breached their duties of loyalty with respect to the Plan by recommending to plan participants that they vote in favor of the Merger; by allowing continued investments in the Aetna Common Stock Fund after the Merger Agreement was signed; failing to migrate plan assets out of the Aetna Common Stock Fund; failing to eliminate the default dividend reinvestment option to reduce continued investment into Aetna stock units at a time when such investment was too risky for retirement assets under the circumstances; failing to make adequate

disclosures regarding the risk of continued investment in Aetna Common Stock Fund after signing of the merger agreement; and failing to prevent prohibited transactions.

173.    None of the fiduciaries wanted to make any announcement or take any action that could have reflected adversely on CVS or the purported business rationale behind the merger. First, because fiduciaries were employees of Aetna and hoped to retain their positions once CVS closed the merger and assumed full control of Aetna.  Second, as a result of the merger, Aetna management's and executives enjoyed accelerated vesting of deferred compensation and other benefits not shared by plan participants invested in Aetna Stock Fund.

174.    As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Class suffered substantial losses.  The Count II Defendants are liable to the Plan and/or Class Members for damages and/or appropriate equitable relief.   The Count II Defendants are responsible to disgorge all profits made as a result of these Defendants 'breaches of fiduciary duties.

## COUNT III

**Against Defendants Aetna And CVS As Plan Administrators For Failure To Prudently And Loyalty Manage The Plan And The Plan's Assets In Violation of ERISA § 404 Or Alternatively For Vicarious Liability Under Respondeat Superior For The Fiduciary Breaches of Their Employees**

175.    Plaintiffs incorporate by this reference the paragraphs above.

176.    At all relevant times, as alleged above, Aetna and CVS as sponsors, and/or administrator of the Plan and/or employers of plan participants were fiduciaries within the meaning of ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, Aetna and CVS were bound by the duties of loyalty, exclusive purpose, and prudence.  In this Count Aetna is liable in its role as a fiduciary, and/or administrator from

December 3, 2017 to November 28, 2018.  Defendant CVS is liable in its role as fiduciary, administrator of the Aetna Plan from November 29, 2018 through February 20, 2019.

177.    AETNA and CVS were also the respective employers of various of the fiduciaries named herein and as such are vicariously liable under theory of respondeat superior for the fiduciary breaches of employees.

178.    Contrary to their duties and obligations under the Plan's documents and ERISA, Aetna and CVS failed to loyally and prudently discharge the fiduciary duties enumerated herein. Specifically, during the Class Period, Aetna and CVS knew, or should have known, that neither Aetna stock units, nor CVS stock units, were prudent, suitable and appropriate investments for the Plan and/or that as of November 2017, buying Aetna stock units for any plan participants' account was not a prudent investment for a participant.

179.    Moreover, Aetna and CVS breached their co-fiduciary duties of prudence and loyalty by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage the Plan's assets with respect to offering Aetna and/or CVS stock as an investment option in the Aetna Plan and providing matching contributions in Aetna and/or CVS stock despite knowing that such failure was a breach; enabling the other Defendants' failure to prudently manage the Plan's assets with respect to the Plan's investments, and having knowledge of the failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

180.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their investments meant to help them save for retirement.  Thus, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Aetna and CVS are

liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

**Failure to Provide Complete and Accurate Information to Participants and Beneficiaries (Breaches of Fiduciary Duties in Violation of ERISA § 404) Against  All Defendant (Collectively The "Count IV Defendants")**

181.  Plaintiffs incorporate by this reference the allegations above.

182.  At all relevant times, as alleged above, all Count IV Defendants were fiduciaries within the meaning of ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had the discretion and power to control information provided to plan participants and beneficiaries through the Offering Materials which should have, but did not adequately inform Plan Participants of the risks of investing in the Aetna Common Stock Fund before and after the Merger.

183.  Because the Count IV Defendants used the proxy as a fiduciary communication to fulfill their responsibilities to communicate to participants  who invested in the  Stock Fund and because the defendants named in this count participated in the drafting and issuance of the Joint Proxy-Prospectus issued to plan participants in connection with the merger vote and participants' investment in Aetna and/or CVS stock units in the Plan, the Count IV Defendants maintained discretion to determine the contents of the disclosures to plan participants required by ERISA and 404(c)(5) whose purpose, as provided in 29 CFR 2550.404a-5, is to provide sufficient information to participants regarding the Plans so they are able to make informed decisions with regard to the management of their individual plan accounts.

184.  According to the terms of the Merger Agreement each of AETNA and CVS had power over each other's SEC filings as follows:

If at any time prior to the later of the approval and adoption of the merger agreement by Aetna's shareholder and the approval of the stock issuance of CVS Health's stockholders, any information relating to Aetna or CVS Health, or any of their respective affiliates, officers or directors, is discovered by Aetna or CVS Health that should be set forth in an amendment or supplement to either this joint proxy statement/prospectus or the registration statement of which it forms a part, so that either of such documents would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the party that discovers such information has agreed to promptly notify the other parties to the merger agreement and the parties have agreed that an appropriate amendment or supplement describing such information will be promptly prepared and filed with the SEC and, to the extent required under applicable law, disseminate to the shareholders of Aetna and the stockholders of CVS Health.

185.    As alleged above, the scope of the Count IV's Defendants' fiduciary duties and responsibilities included disseminating Plan documents and information to Plan participants regarding the Plan and its assets.  In addition, the Count IV Defendants had a duty to provide Plan participants with information Count IV Defendants possessed that they knew, or should have known, would have a material impact on the Plan and its participants' investment choices.

186.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform includes an obligation to provide Plan participants and beneficiaries with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options such that Participants can make informed decisions with regard to investment options available under the Plan, this duty applies to all of the Plan's investment options, including investment in Aetna and/or CVS common stock units.

187.    This fiduciary duty to communicate honestly with participants is designed to allow participants to know and understand all the material risks of their choices of investment options. By failing to discharge their disclosure duties, the Count IV Defendants imprudently allowed Aetna and/or CVS stock to remain available as an investment alternative for participants.

188.    The Count IV fiduciaries had ample reason to believe, or at least suspect, that investing in CVS and/or AETNA stock units for 401K accounts was imprudent for the reasons set forth herein. In contrast, the plan participants did not have access to such information.

189.    Had Count IV Defendants complied with their duties they would have closed the Aetna common stock fund to new investments and/or migrated assets out of the Aetna common stock fund or taken other steps to protect plan assets due to the imminent danger to CVS/Aetna's stock units' value from the inevitable disclosure of asset value deterioration. Count IV Defendants had a fiduciary duty to correct any prior statements that became misleading.

190.    Because,post-merger, a  substantial percentage of the Plan's assets were invested in CVS stock units, and Count IV Defendants chose to allow class members to invest a high percentage of plan assets in CVS stock units, such investment carried with it an inherently high degree of risk.  This inherent risk made the Count IV Defendants' duty to provide complete and accurate information particularly important with respect to the risk of investing in Aetna and/or CVS stock units.

191.    The Count IV Defendants breached their ERISA mandated duty to inform participants by failing to provide complete and accurate information regarding Aetna and CVS and CVS stock, and, generally, by conveying, through statements and omissions, false and misleading information regarding the soundness of CVS and its stock.

192.    Upon information and belief, such communications were disseminated directly to all Plan participants, including the Joint Proxy-Statement Prospectuses, which incorporated by reference CVS's materially misleading and inaccurate SEC filings and press releases, through its officers and directors.   In addition, upon information and belief, the Count IV Defendants communicated directly with all Plan participants regarding the merits of investing in CVS and its stock in companywide and uniform communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding CVS business, operations and financial condition and the risk inherent in investing in Aetna and/or CVS stock during the Class Period.

193.    The Count IV Defendants' failure to provide complete and accurate information regarding CVS and/or its stock was uniform and affected the entire Plan, and impacted all participants in the Plan the same way in that none of the participants received crucial, material information regarding the risks of Aetna and/or CVS and/or CVS stock as an investment option and all of the Plan's acquisitions of employer stock during the Class Period occurred at inflated prices.

194.    As a consequence of the Count IV Defendants' breaches of fiduciary duty, the Plan and its participants suffered tremendous losses.  If the Count IV Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

## COUNT V

### Prohibited Transactions in Violation of ERISA §406(a)(1) (A) and (D)
### Against Defendants CVS And Aetna (The "Count V Defendants")

195.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

196.    Defendants CVS, Aetna, the Count V Defendants were "parties-in-interest" as of March 13, 2018 when Aetna's shareholders voted to approve the merger between CVS and Aetna as defined by ERISA Sections 3(14) a, c, e, g and h, which provide, respectively:

(a)    Any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan;

(b)    An employer any of whose employees are covered by such plan;

(c)    An owner, direct or indirect, of 50 percent or more of (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation; (ii) the capital interest or the profits interest of a partnership, or (iii) the beneficial interest of a trust or unincorporated enterprise, which is an employer or an employee organization described in subparagraph (c) or (d);

(d)    A corporation, partnership, or trust or estate of which (or in which) 50 percent or more of (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation, (ii) the capital interest or profits interest of such partnership, or (iii) the beneficial interest of such trust or estate, is owned directly or indirectly, or held by persons described in subparagraph (a), (b), (c), (d), or (e); and

(e)    An employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors), or a 10 percent or more shareholder

64

directly or indirectly, of a person described in subparagraph (b), (c), (d), (e), or (g), or of the employee benefit plan.

197.    Aetna as a fiduciary, and/or an employer and CVS as a direct or indirect 50% owner of Aetna, were parties in interest under ERISA §3(14)(a),(c),(h), 29 U.S.C. §1002(14)(a),(c) and (h), respectively.

198.    Count V Defendants are fiduciaries of the Plan within the meaning of ERISA §3(21), 29 U.S.C. §1002(21) who caused the Plan to offer Aetna stock units and/or the CVS stock units in the Plan and to continue offering the CVS common stock units after the Merger.

199.    ERISA §406(a)(1), 29 U.S.C. §1106(a)(1) provides, in pertinent part, that a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

       (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;

       *     *     *

       (D)    transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan . . . .

200.    As explained more fully herein, the exchange of Aetna stock in the plan for CVS stock and cash in November 2018 was a "prohibited transaction" as defined by ERISA:

a.    ERISA section 406(a) prohibits various types of transactions between a plan and parties in interest.

b.    ERISA states that a plan fiduciary shall not cause the plan to engage in a transaction if the plan fiduciary knows or should know that such transaction constitutes a direct or indirect—

•    Sale or exchange, or leasing, of any property;

•    Transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

c.      ERISA section 406(b) also prohibits certain transactions between the plan and the plan fiduciary considered to be "self-dealing."  A plan fiduciary is prohibited from using the plan's assets in their own interest or representing an adverse party in a transaction involving a plan (prohibition on being on both sides of a transaction).

201.    By selecting AETNA/CVS as the options in the Plan and by maintaining these as the options in the Plan and allowing the exchange of Aetna stock for CVS stock, Defendants engaged in a prohibited transactions in violation of ERISA §406(a)(1) (A),  and (D), 29 U.S.C. §1106(a)(1) (A) and (D).

202.    While certain statutory "blanket" exemptions from prohibited transactions are built into ERISA Rules, *i.e.* PTE 77 *et seq.* none are here applicable:

> Class exemptions are administrative "blanket" exemptions that permit a person to engage in a similar transaction or a series of similar transactions with a plan in accordance with the terms and conditions of the class exemption, without requiring the person to obtain an individual exemption from the DOL.

203.    There are also only two "individual" exemptions which were available to allow CVS/Aetna to engage in the prohibited transactions alleged herein:

> Individual exemptions are administrative exemptions that apply only to the specific person named or otherwise defined in the exemption, and allow such person to engage in a variety of transactions that would be otherwise prohibited. Individual exemptions apply only to the applicant; other plans may not rely on those exemptions even if all of the conditions are met.

> Individual exemptions that have been granted by the DOL are found on the DOL EBSA's website at http://www.dol.gov/ebsa/regs/masterindex.html.

> For example, individual exemptions are frequently requested in connection with the following:

- Acquisitions or mergers;

66

- In-kind purchases or transfers.

204. The DOL EBSA website does not list any individual exemption granted to either CVS or Aetna for any of the transactions described herein.

205. As parties in interest, Defendants are liable for these violations of ERISA §406(a)(1) (A), (C) & (D), 29 U.S.C. §1106(a)(1) (A), (C) and (D) pursuant to ERISA §502(a)(3).

206. As a result of these prohibited transactions, Defendants profited at the expense of the Plan and the Class.

207. Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Count IV Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and/or are liable for appropriate equitable relief to class members.

## COUNT VI

### Prohibited Transactions in Violation of ERISA §406(b)(1) and (3) Against CVS and Aetna the Count VI Defendants

208. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

209. ERISA §406(b), 29 U.S.C. §1106(b), provides, in pertinent part, that a fiduciary with respect to a plan shall not:

(1) deal with the assets of the plan in his own interest or for his own account,

or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

210. Defendant CVS was a fiduciary of the Plan within the meaning of ERISA §§3(21) and 406(b)(1), 29 U.S.C. §§1002(21) and 1106(b)(1).

67

211.    Defendant CVS dealt with the assets of a plan in its own interest or for its own account by exchanging Aetna stock units for CVS stock units in the Plan, and thereby CVS caused the Plan to engage in a prohibited transaction in violation of ERISA §406(b)(1) and (3), 29 U.S.C. §1106(b)(1) and (3).

212.    With respect to the AETNA stock Fund, Aetna and/or CVS engaged in prohibited transactions as follows:

(a)    by causing the Plan to engage in transactions that it knows or should know constitute direct or indirect transfers of the Plans 'assets to, or use of the Plans 'assets by or for the benefit of, parties in interest, in violation of 29 U.S.C. §1106(a)(1)(D);

(b)    by causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan dealt with the assets of the plan in its own interest or for its own account in violation of 29 U.S.C. §1106(b)(1);

(c)    by causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan, CVS in any capacity, acted on behalf of a party whose interests were adverse to the interests of the Plan or the interests of its participants or beneficiaries, in violation of 29 U.S.C. §1106(b)(2).

213.  As fiduciaries and parties in interest, the Count VI Defendants are liable for these violations of  ERISA §406(b)(1) and (3), 29 U.S.C. §1106(b)(1) and (3), pursuant to ERISA §502(a)(3).

214.    Pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), the Count VI Defendants Aetna and CVS are liable to disgorge all amounts and profits received as a result of these prohibited transactions, and such other appropriate equitable relief as the Court deems proper.

## <u>COUNT VII</u>

**Breaches of Fiduciary Duties of Prudence and Loyalty in Violation of
ERISA §404(a) Against Aetna and CVS Benefits Committee (the "Count VII Defendants")
<u>for Failure to Monitor Other Fiduciaries</u>**

215.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

216.    The Count VII Defendants were fiduciaries of the Plan under ERISA §3(21) (A), 29 U.S.C. §1002(21) (A), because they were responsible for appointing and removing fiduciaries of the Plan; for authoring and forwarding communications to plan participants that were for the purpose of advising plan participants about actions to be taken with respect to their investments in plan assets; for periodically monitoring their performance and to ensure they were performing their duties properly and in accordance with ERISA.

217.    As fiduciaries of the Plan, the Count VII Defendants were and continue to be required pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1), to act solely in the interest of the participants and beneficiaries of the Plan they served and (A) "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," and (B) to discharge their duties on an ongoing basis "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  Consistent with these duties, the Count VII Defendants were required to ensure that the monitored fiduciaries were performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

218.    To the extent the Count VII Defendants delegated fiduciary monitoring responsibilities to other fiduciary Defendants, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were performed prudently and loyally.

219.    The Count VII Defendants breached their fiduciary monitoring duties by, among other things:

(a)    failing to monitor the processes by which the Plan's investments were chosen, evaluated and retained, which would have alerted a prudent fiduciary to the risks of Aetna, CVS and/or its stock;

(b)    failing to monitor the process by which the Aetna and/or CVS common stock funds investments were chosen, evaluated or retained, which would have alerted a prudent fiduciary to the risks of those funds;

(c)    failing to monitor their appointees to ensure that they considered alternatives to the CVS and/or Aetna common stock funds; and

(d)    failing to remove fiduciaries whose performance was inadequate in that they continued to maintain costly and self-serving investments in the Plan, all to the detriment of the Plan and the Plan's participants 'retirement savings, including Plaintiffs and members of the Class.

220.    As a direct and proximate result of these breaches of the duty to monitor, the Plan, Plaintiffs and members of the Class have suffered substantial losses in the form of higher fees and/or lower returns on their investments than they would have earned by the prudent and loyal investment of Plan assets.

221.    Pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), Count VII Defendants are liable to disgorge all unlawful profits received from

the Plan directly or indirectly, and restore all losses suffered by the Plan caused by their breaches

of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

## COUNT VIII

### Co-fiduciary Liability Under ERISA §405 Against Each Fiduciary

222.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing

paragraphs as if fully set forth herein.

223.    ERISA §405(a), 29 U.S.C. §1105(a), imposes liability on a fiduciary, in addition to

any liability, which he may have had under any other provision of ERISA, if:

(1)    he participates knowingly in or knowingly undertakes to conceal an
act or omission of such other fiduciary knowing such act or omission is a
breach;

(2)    by his failure to comply with ERISA §404(a)(1) in the
administration of his specific responsibilities which give rise to his status as
a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    he knows of a breach by another fiduciary and fails to make
reasonable efforts to remedy it.

224.    The Count VIII Defendants were all fiduciaries of the Plan within the meaning of

ERISA §402(a), 29 U.S.C. §1102(a), ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), or both.

225.    Each of the Count VIII Defendants knew of each breach of fiduciary duty by the

other fiduciaries alleged herein arising out of the imprudent investment of the assets of the Plan in

the Common stock funds and prohibited transactions and the associated breaches.  Yet, they

knowingly participated in fiduciary breaches, breached their own duties enabling other breaches,

and/or took no steps to remedy other fiduciary breaches.

226.    As some if not all of the individual defendants were employees, officers or directors

of Defendants Aetna and/or CVS, their knowledge is imputed to Aetna and/or CVS.  Defendants

Aetna and/or  CVS knew of the breach of fiduciary duty by each of them arising out of the

imprudent investment of the assets of the Plan in the Aetna and/or CVS Funds and the associated

breaches and Aetna and /or CVS had knowledge of its own fiduciary breaches in which these other

fiduciaries participated.   Yet, the Count VIII Defendants knowingly participated in fiduciary

breaches, breached their own duties enabling other breaches, and/or took no steps to remedy other

fiduciary breaches.

## COUNT IX

**In The Alternative, If CVS And/Or the CVS Individual Defendants For The Period Prior To CVS Takeover Of Control Of The Aetna Plan Are Deemed Not To Be ERISA Fiduciaries, Then Said Defendants Are Named In
This Count as Non-Fiduciary Defendants Under ERISA 502(a)(3) For Knowing Participation In Aetna Fiduciaries' Breach Of ERISA Duties Under ERISA 404 And For Knowing Participation In Prohibited Transactions Under ERISA 406**

227.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing

paragraphs as if fully set forth herein.

228.    Plaintiffs have standing to bring this action under *Harris Trust and Savings Bank*

*v. Salomon Smith Barney Inc*., 530 U.S. 238, 245 (2000) which authorizes a civil action by a plan

participant against a non-fiduciary who participates in a transaction prohibited by 29 USC § 1106.

229.    ERISA §502(a)(3), 29 U.S.C. §1132(a)(3) imposes liability not only on fiduciaries

of the Plan but also on non-fiduciaries of the Plan who knowingly participate in fiduciary breaches

or other violations of ERISA or the terms of the Plan.  As such, CVS and/or the CVS Individual

Defendants or Aetna officers and directors who are not "named fiduciaries,", or even if not

"functional fiduciaries" can be held liable if they knowingly participated in the fiduciary breaches

or violations of any fiduciary of the Plan.

230.    The Count IX Defendants had actual and constructive knowledge that the

fiduciaries' conduct as alleged herein constituted a breach of duties under ERISA and/or knew that

the exchange of Aetna shares for CVS shares at the stated exchange rate constituted a prohibited transaction in breach of ERISA 406.

231.    The Count IX Defendants knowingly participated in the fiduciary breaches and prohibited transactions alleged herein.

232.    As a result of the Count IX Defendants' knowing participation in fiduciary breaches and prohibited transactions, the Plan suffered a cognizable loss of which the Defendants named in this Count are responsible.

233.    As a result the Plan and/or participants are entitled to appropriate equitable or legal relief including disgorgement of any profits or equitable restitution or other appropriate  relief pursuant to 502(a)(3).

## COUNT X

**Against CVS, The CVS Benefits Plan Committee, The Benefits Plan Administrative Subcommitee, The Benefits Plan Investment Subcommittees And CVS Does 1-10 For Breach Of Duty Of Prudence And Loyalty In Violation Of ERISA 404(A) In Their Role As Fiduciaries Of The Aetna Plan After The Merger Through The End Of The Class Period**

234.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

235.    The "Count __Defendants" were fiduciaries of the Plan under BRISA §3(21), 29 U.S.C.  §1002(21) and/or 1102(a)(l),  during their respective tenures,  as a result of (1) their responsibilities for,  *inter alia,* management of the plan,  investment options and plan assets and concerning the addition of new investment options or the suspension or divestiture of any existing investment options; (2) being named fiduciaries under the Plan;  and/or (3) because they managed and/or disposed of Plan investment options,  and were charged with taking action and/or making recommendations about the prudence of the Plan investments.

236.    As fiduciaries of the Plan, the Count _ Defendants were required pursuant to BRISA §404(a)(l)(B), 29 U.S.C.  §1104(a)(l)(B), to discharge their duties with respect to the Plan

solely in the interests of the participants  and beneficiaries, and   "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

237.    Under BRISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a Plan's assets are responsible for ensuring that investment options made available to Participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  Count I Defendants were responsible for ensuring that all investments in the Plan were prudent and that such investments were consistent with the purpose of the Plan.   The Defendants named in this Count are thus liable for losses incurred as a result of investments in CVS stock unit being an imprudent investment alternative and for failure to diversify after the merger closed.

238.    According to Department of Labor ("DOL") regulations, a fiduciary's  investment or investment course of action is prudent if: () he has given appropriate consideration  to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (ii) he has acted accordingly.  29 CFR 2550.404a-1.

239.    DOL regulations further specify that "appropriate consideration" in this context includes, but is not necessarily  limited to:   A determination  by the fiduciary  that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion  of the plan portfolio  with respect to which the fiduciary  has investment duties),  to  further  the purposes  of the plan,  taking  into  consideration  the risk  of loss  and the opportunity for gain (or other return) associated with the investment or investment course of action.

240.   Moreover, a fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives which it knows, or reasonably should know, would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA $ 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

241.   ERISA's duty of prudence required the Count _ Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary duties, they knew or should have known were relevant to the risks inherent in having plan assets invested in the CVS Stock Fund and to act accordingly.  *See* 29 C.F.R. §2550.404al.  The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble,* 135 S. Ct. at 1828.

242.   As described above, the Count_ Defendants failed to properly evaluate the prudence of the Plan's investments in CVS after the merger.   A prudent fiduciary, in possession of the information about the risks to the value of CVS Stock units in class members accounts after the merger herein, would have taken steps to protect plan assets and removed the CVS Stock Fund as an investment option in the Plan and/or migrated assets out of the CVS Plan and/or closed it to new investments and/or terminated the dividend reinvestment option or other viable options described herein.

243.   Fiduciaries' reliance on the market price of CVS stock after the merger, was imprudent because CVS' s stock price after the merger failed to reflect the extent of the impairment of CVS prescription drug business due to the Illegal Prescription Schemes.

244.     Through these actions and omissions, Count _ Defendants failed to discharge their duties with respect to the Plan:   to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(l)(B), 29 U.S.C.  §1104(a)(l)(B).

245.     As a direct and proximate result of these breaches, the Plan, Plaintiff and members of the Class suffered substantial losses than they would have otherwise experienced had the CVS Stock Plan been closed to new investment and/or divested.  The Count      Defendants are liable to the Plan and/or Class members for damages and/or appropriate equitable relief.

## ENTITLEMENT TO RELIEF

246.     By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the members of the Class are entitled to sue each of the fiduciary Defendants pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), for relief on behalf of the Plan as provided in ERISA §409, 29 U.S.C. §1109, including for recovery of any losses to the Plan, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

247.     By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the members of the Class are entitled, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), to sue any of the Defendants for any appropriate equitable relief for themselves to redress the wrongs described above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring that each of the Defendants who are fiduciaries of the Plan have breached their fiduciary duties under ERISA;

B.      Ordering each fiduciary found to have breached his/her/its fiduciary duties to the Plan and/or plan participants  jointly and severally restore all losses to the Plan and/or to Plan Participants  that resulted from the breaches of fiduciary duty, or by virtue of liability pursuant to ERISA §406;

C.      Entering an order requiring: (a) the disgorgement of profit made by any Defendant; (b) declaring a constructive trust over any assets received by any breaching fiduciary in connection with his/her/its breach of fiduciary duties, or violations of ERISA, or under 502(a)(3) against any non-fiduciary Defendant who knowingly participated in that breach or violation; (c) any other appropriate equitable monetary relief, whichever is in the best interest of the Plan;

D.      Removing any breaching fiduciaries as fiduciaries of the Plan;

E.      Ordering the Plan's fiduciaries to provide a full accounting of all profits and/or benefits accruing to each of them as a result of any of fiduciary breach and to forfeit same to the Plan and/or a plan participants as appropriate;

F.      Awarding Plaintiffs and the Class their attorneys' fees and costs pursuant to ERISA §502(g), 29 U.S.C. §1132(g), the common benefit doctrine and/or the common fund doctrine;

G.      Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest;

H.      Awarding such equitable, injunctive or other relief as the Court may deem appropriate pursuant to ERISA §502(a)(2) and/or (a)(3) or any relief to which Plaintiffs and the Class are entitled to pursuant to Fed. R. Civ. P. Rule 54(c); and

       I.       Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

Dated: October 29, 2021

                                                    **IZARD, KINDALL & RAABE, LLP**

                                                By:*/s/Mark P. Kindall*_____
                                                    Mark P. Kindall
                                              29 South Main Street, Suite 305
                                            West Hartford, Connecticut 06107
                                            Telephone:  (860)493-6294
                                            Email: mkindall@ikrlaw.com

                                            Lee Squitieri
                                            **SQUITIERI & FEARON, LLP**
                                            32 East 57th Street
                                            12th Floor
                                            New York, New York 10022
                                            Telephone:  (212) 421-6492
                                            Email:  lee@sfclasslaw.com

                                            *Attorneys for Plaintiffs*