## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RAYMOND RADCLIFFE, et al.,
　　　　　*Plaintiffs*,

　　　v.

AETNA, INC., et al.,
　　　　　*Defendants.*

No. 3:20-cv-01274-VAB

## RULING AND ORDER ON MOTION TO DISMISS

Raymond Radcliffe and Carol Flaim ("Plaintiffs") have filed a second amended consolidated putative class action Complaint ("SAC" or "Second Amended Complaint") against Aetna, Inc., CVS Health Corporation, the Aetna Benefits Finance Committee, Larry J. Merlo, , Mark T. Bertolini, Eva C. Boratto, Aetna Does 1-20, and CVS Does 1-20 ("Defendants"), alleging that Defendants failed to seek leave to file their SAC and breached their fiduciary duty to Plaintiffs as participants in Aetna's employee stock ownership plan under § 404 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1104, and engaged in prohibited transactions in violation of ERISA § 406(a) and § 406(b), 29 U.S.C. § 1106(a), (b). *See* SAC, ECF No. 49 (Oct. 29, 2021) ("SAC").

Defendants move to dismiss the suit for failure to state a claim upon which relief can be granted and improperly filing a pleading without asking the Court for leave or Defendants for consent.

For the following reasons, Defendants' motion to dismiss is **GRANTED** with prejudice.

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

    **A.  Factual Allegations**

        **1.  Aetna, Inc. and the Aetna 401(k) Plan**

Aetna is a wholly owned subsidiary of CVS. SAC ¶ 29. Before merging with CVS in 2018, Aetna was a diversified health benefits company that offered health insurance products and services. *Id.* ¶ 58.

Between December 3, 2017, and February 20, 2019 (the "Class Period"), Aetna sponsored a 401(k) participant-directed defined contribution plan (the "Plan" or "Aetna Plan"), "a voluntary savings plan that provide[d] retirement income to eligible employees who [were] U.S. employees, employed by Aetna Inc. [ ] or a participating subsidiary company." *Id.* ¶ 40.

Under the Plan, "[n]ew and rehired employees [were] automatically enrolled in the Plan at a 3% pretax contribution rate unless the employee ch[ose] a different rate or opt[ed] out of participation." *Id.* Participants in the Plan were permitted to direct their investment and employer contributions among twenty-two investment options offered by the Plan, including the Aetna Common Stock Fund ("Stock Fund"). *Id.* ¶ 41. This portion of the Plan was designated as an "employee stock ownership plan" ("ESOP"), under which a participant could elect to receive "in cash, dividends that [were] paid on stock in the Stock Fund or else reinvest dividends in the Stock Fund." *Id.* ¶ 42. If the participants did not make an election, their dividends were automatically re-invested in the Stock Fund. *Id.*

Allegedly, "[t]he Plan's investment in Aetna stock units was a material portion of the Plan's assets." *Id.* ¶ 44. From the end of 2016 to December 31, 2017, the Plan's investment in Aetna common stock units, calculated at market price, allegedly rose from $866,271,483 to $1,144,635,702. *Id.* During the same period, participants' investment in Aetna units allegedly

increased from 11.8% of total plan assets to 13.6% and the "dollar amount of Aetna stock units in the Plan" allegedly increased by 32.1%. *Id.*

### 2. The Merger Agreement

In mid-2017, Aetna allegedly began discussions with CVS "to explore whether a combination of Aetna and CVS could be agreed whereby CVS, the larger of the two companies, would in effect take over Aetna and absorb it into CVS." *Id.* ¶ 84.

During these negotiations, Aetna allegedly "had access to an electronic data room containing non-public financial, legal and other information about CVS." *Id.* ¶¶ 84, 125. Aetna's financial advisors and Aetna management also allegedly "met with CVS representatives and financial advisors to discuss the financial information." *Id.* ¶ 84.

On December 3, 2017, CVS and Aetna announced the execution of a merger agreement ("Merger Agreement") under which Aetna shareholders would receive $145 per share in cash and 0.8378 shares of CVS common stock for each share of Aetna stock. *Id.* ¶ 85. The transaction allegedly valued Aetna at approximately $207 per share, or $77 billion, including $8 billion in net debt. *Id.* In the Merger Agreement, CVS and Aetna allegedly agreed "to keep each other informed of each other's operations and financial condition." *Id.* ¶ 91.

On December 1, 2017, the last trading day before the Merger Agreement was announced, "Aetna was trading at approximately $177 per share." *Id.* ¶ 86. After the announcement of the Merger Agreement, Aetna's stock price allegedly "increased to meet the implied value of [the] CVS Merger consideration." *Id.*

### 3. CVS's Acquisition of Omnicare

Plaintiffs allege that "in 2017 and 2018 CVS was facing profound risks to its operations which were not fully disclosed to, nor appreciated by[,] the investing public." *Id.* ¶ 6.

On August 18, 2015, CVS acquired Omnicare, "a provider of pharmaceuticals and related pharmacy services to [long-term care] facilities (*e.g.*, assisted living, skilled nursing, and senior centers) and a provider of specialty pharmacy and commercialization services for the bio-pharmaceutical industry." *Id.* ¶ 65. CVS allegedly "promoted the Omnicare acquisition as a key move to expanding CVS's business throughout multiple markets related to pharmaceutical care." *Id.* ¶ 66.

CVS allegedly acquired Omnicare for $9.6 billion and assumed long-term debt with a fair value of approximately $3.1 billion. *Id.* ¶ 66. At acquisition, CVS allegedly estimated that the fair value of the Omnicare assets it acquired "included $9.1 billion of goodwill." *Id.*

After the acquisition, CVS's retail segment's long-term care ("LTC") unit was "largely compris[ed]" of Omnicare. *Id.* ¶ 65. Allegedly, "[b]ecause CVS merged the Omnicare Long-Term Care business into its Retail segment to create the Retail/LTC segment, the Company largely allocated the Omnicare goodwill to its Retail/LTC segment." *Id.* ¶ 68. As a result, "CVS reported that '[g]oodwill of $8.6 billion was allocated to the Retail/LTC Segment[.]'" *Id.* Plaintiffs allege that of the $8.6 billion allocated to the retail/LTC segment, "$6.4 billion was allocated to the Omnicare Long-Term Care reporting unit, and . . . is the goodwill that is at issue in this case." *Id.*

In 2016, CVS's Retail/LTC segment allegedly lost two pharmacy contracts, "causing CVS stock to drop 20%." *Id.* ¶ 69. By late 2016, CVS allegedly "was not realizing all of the expected benefits of the Omnicare acquisition," and its retail pharmacy segment "faced significant reimbursement pressure." *Id.* Plaintiffs allege that, by early 2017, CVS knew that it was "experiencing factors indicating that its Omnicare-related goodwill asset was impaired or at substantial risk of experiencing an impairment write down." *Id.* ¶ 75.

4

Allegedly, as CVS "steadily los[t] LTC market share in 2017, CVS responded to these negative factors . . . by targeting LTC pharmacies for acquisition[.]" *Id.* ¶ 77.

In early 2017, CVS Omnicare acquired ModernHealth, "a large Southern California LTC pharmacy services business which . . . generat[ed] over $70 million in sales annually." *Id.* ¶ 78. In the third quarter of 2017, allegedly "all but 25 people at Modern Health were terminated by CVS/Omnicare." *Id.* In late 2017, CVS also acquired Pharmore Drugs, "the largest independently owned LTC pharmacy in Illinois." *Id.* Following the acquisition, CVS allegedly "filed WARN notices [required] in Illinois . . . due to CVS'[s] plan to engage in massive layoffs at Pharmore." *Id.*

In late 2017, CVS allegedly continued to experience "reimbursement pressure at its retail/LTC business," which "had been cited by CVS as a cause [of] CVS'[s] 17% year over year net income decline" in the first quarter of 2017. *Id.* ¶ 80.

### 4. Government Investigation of Omnicare

On June 1, 2015, Omnicare was sued "in a qui tam action for violating the Federal False Claims Act, and state and local false claims acts, by seeking reimbursement for drugs illegally delivered to patients in Omnicare's assisted living and skilled nursing facility clients." *Id.* ¶ 112.

In October 2015, following its acquisition of the company, CVS received a Civil Investigative Demand from the United States Attorney's Office for the Southern District of New York requesting information and documents relating to Omnicare's "cycle fill process," or process of regularly refilling prescriptions for assisted living facilities. *Id.* ¶ 69.

On December 13, 2019, the original complaint against Omnicare was unsealed. Am. Compl. ¶ 112.

On December 17, 2019, after several years of investigation, the U.S. Department of Justice intervened in the *qui tam* action on behalf of the United States and filed a lawsuit against Omnicare and CVS under the False Claims Act. *Id.* The Department of Justice complaint alleged that from 2010 to 2018, CVS "fraudulently billed federal healthcare programs for hundreds of thousands of non-controlled prescription drugs dispensed on stale, invalid prescriptions to elderly and disabled individuals." *Id.* This "rollover prescription scheme" allegedly affected Omnicare's assisted living facilities, "which represented 24% of Omnicare's prescription volume as of January 2017," and encompassed patients in more than three thousand residential long-term care facilities. *Id.* ¶120.

Plaintiffs allege that "[r]eported results at Omnicare had been inflated by revenues earned in the [i]llegal [p]rescription [s]cheme." *Id.* ¶ 7.

### 5. Aetna's Merger with CVS

On January 4, 2018, CVS filed with the U.S. Securities and Exchange Commission ("SEC") a preliminary Registration Statement on Form S-4 for the issuance of CVS shares to be exchanged for Aetna stock in the merger. *Id.* ¶ 89. The SEC declared the Registration Statement effective on February 9, 2018, and Aetna "provided plan participants with the Joint Proxy Prospectus[,] which included the substantive portions of the Registration Statement." *Id.* Aetna allegedly provided these documents in order "to solicit plan participants['] vote in favor of approval of the merger and to provide to [them] information about the CVS stock units they would receive for their Aetna stock units in their 401(k)." *Id.*

The Joint Proxy Prospectus, which was provided to the Plan participants, "expressly incorporated by reference several SEC filings," including CVS's 2016 and 2017 annual reports; quarterly reports for the fiscal quarters ending on March 31, 2017, June 30, 2017, and September

30, 2017; and CVS's Proxy Statement on Schedule 14A filed on March 31, 2017. *Id.* ¶ 89.

The Joint Proxy Prospectus allegedly disclosed that "[t]he fair value[ ] of [CVS's] LTC . . . reporting unit[ ] exceeded [its] carrying values by 7%[.]" *Id.* ¶ 91. CVS also allegedly stated that "[t]he balance of goodwill for [CVS's] LTC and RxCrossroads reporting units at December 31,[ ] 2016 was approximately $6.4 billion and $0.6 billion, respectively." *Id.*

On January 4, 2018, Defendants held a "CVS Health 2018 Guidance Call" with securities analysts, during which Defendants allegedly stated that CVS "expect[ed] solid script growth driven by new initiatives tailored toward assisted living facilities and benefits from acquisition growth. As a result, for the entire Retail/Long-Term Care segment, [CVS] expect[ed] revenue growth of 2.5% to 4%." Am. Compl. ¶ 111.

On February 14, 2018, CVS filed its 2017 annual report. *Id.* ¶ 102. The Form 10-K "contained representations similar to those in the 2016 Form 10-K and was also expressly incorporated into the [Joint Proxy Prospectus]." *Id.* CVS disclosed that "an impairment analysis had been performed during the fiscal year end[ing] December 31, 2017," and "[t]he fair value[ ] of [CVS's] LTC reporting unit[ ] . . . exceeded [its] carrying value[ ] by approximately 1%." *Id.* ¶ 103.

On March 13, 2018, CVS and Aetna shareholders approved the Merger Agreement, "including the provisions whereby Aetna plan participants' Aetna units would be exchanged for CVS units." *Id.* ¶126.

On May 2, 2018, CVS filed its Form 10Q for the period ending on March 31, 2018. Ex. 10 to Mot. to Dismiss, ECF No. 22-12 (Dec. 22, 2020) ("Ex. 10 to Defs.' Mot."). In the form, CVS disclosed that its "LTC reporting unit continue[d] to face challenges that [could] affect [CVS's] ability to grow the business at the rate that [CVS] had originally estimated when [it] made the acquisition of Omnicare and when [it] performed [its] prior year annual goodwill

7

impairment test." *Id.* at 42. The company stated that "[i]f [CVS] d[id] not achieve [its] forecasts, . . . it is reasonably possible that the operational performance of the LTC reporting unit could be below [its] current expectations in the near term and the goodwill of the LTC reporting unit could be deemed to be impaired by a material amount." *Id.*

In June 2018, CVS allegedly updated its LTC unit forecasts "to reflect the sharply declining LTC business" since early 2017. Am. Compl. ¶ 127. In August 2018, CVS announced that its "2018 second quarter results (April 1, 2018 to June 30, 2018) represented a $3.9 billion charge related to impaired goodwill for its LTC unit related to poor actual and projected Omnicare performance." *Id.* (emphasis omitted). CVS further disclosed,

> Though we believe the financial projections used to determine the fair value of the LTC reporting unit as of June 30, 2018 are reasonable and achievable, our LTC reporting unit may continue to face challenges that may affect our ability to grow the business at the rate we estimated when we performed such goodwill impairment test. If we do not achieve our forecasts, given that the fair value and the carrying value of the LTC reporting unit were the same as of June 30, 2018, it is reasonably possible in the near term that the goodwill of the LTC reporting unit could be deemed to be impaired again by a material amount.

*Id.*

On November 6, 2018, CVS reported that it had performed its required annual impairment tests of goodwill, and "[t]he results of the impairment tests indicated that there was no impairment of goodwill." Ex. 12 to Mot. to Dismiss at 46, ECF No. 22-14 (Dec. 22, 2020). CVS noted that "[t]he fair value of [its] LTC reporting unit exceeded its carrying value by approximately 2%," but "[i]f [CVS] d[id] not achieve [its] forecasts, it [was] reasonably possible in the near term that the goodwill of the LTC reporting unit could be deemed to be impaired again by a material amount." *Id.*

On November 28, 2018, the merger closed, with Aetna shareholders receiving cash and CVS stock units valued at $80 per share in exchange for their Aetna stock. Am. Compl. ¶ 19. The Plan merged into the CVS Health Future Fund 401(k) Plan on January 1, 2020. *Id.* ¶ 1.

On February 20, 2019, CVS issued a press release announcing its fourth quarter and full year 2018 results and providing 2019 full year guidance. *Id.* ¶ 130. In the release, CVS announced that it would take a $2.2 billion impairment charge on the Omnicare goodwill for the fourth quarter of 2018. *Id.* CVS stated that it had "'continued to experience' materially rising costs and poor financial results during the fourth quarter of 2018" due to "lower occupancy rates in skilled nursing facilities, significant deterioration in the financial health of numerous skilled nursing facility customers which resulted in a number of customer bankruptcies in 2018, and continued facility reimbursement pressures." *Id.*

In 2019, six months after the merger closed, the CVS stock price allegedly was trading in the "$60 per share range, far below the price of CVS shares during most of 2018." *Id.* ¶ 135.

Plaintiffs allege that, because the Plan's "holdings in Aetna stock units comprised a significant percentage of the overall value of the assets the Plan held on behalf of its beneficiaries after the merger was approved, the long-term retirement savings of Plaintiffs and members of the Class were dependent, to a substantial degree, on the performance of CVS common stock." *Id.* ¶ 16.

### B.  Procedural History

On August 28, 2020, Raymond Radcliffe filed his putative class action Complaint. Class Action Compl., ECF No. 1 (Aug. 28, 2020); Corrected Class Action Compl., ECF No. 2 (Aug. 28, 2020).

On November 3, 2020, Mr. Radcliffe and Ms. Flaim moved to consolidate this case with

*Flaim v. CVS Health Corp.*, No 3:20-cv-01321, and to file an Amended Complaint. Pls.'
Consented-To Mot. to Consolidate Related Cases and File a Consolidated Am. Compl., ECF No.
8 (Nov. 3, 2020). The Court granted Plaintiffs' motion on November 4, 2020. Order, ECF No. 9
(Nov. 4, 2020).

On November 12, 2020, Plaintiffs filed a consolidated class action Complaint. Am.
Compl.

On December 22, 2020, Defendants filed their motion to dismiss the consolidated
Complaint. Mot. to Dismiss, ECF No. 22 (Dec. 22, 2020); Mem. of Law in Supp. of Defs.'
Mot. to Dismiss, ECF No. 22-1 (Dec. 22, 2020) ("Defs.' Mot.").

On February 4, 2021, Plaintiffs filed their opposition to Defendants' motion to dismiss.
Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, ECF No. 38 (Feb. 4, 2021) ("Opp'n").

On February 25, 2021, Defendants filed a reply in support of their motion to dismiss.
Reply Mem. of Law in Supp. of Defs.' Mot to Dismiss, ECF No. 39 (Feb. 25, 2021) ("Defs.'
Reply").

On March 5, 2021, Defendants filed a notice of supplemental authority relating to a New
York state court case cited by Plaintiffs in their opposition to their motion to dismiss. Notice of
Suppl. Authority in Supp. of Defs.' Mot. to Dismiss the Am. Compl., ECF No. 40 (Mar. 5,
2021). Plaintiffs filed a reply to Defendants' notice of supplemental authority on March 19,
2021. Resp. to Notice of Suppl. Authority Submitted by Defs., ECF No. 41 (Mar. 19, 2021).

On July 23, 2021, Plaintiffs filed a notice of supplemental authority regarding a federal
district court decision relating to the False Claims Act action against Omnicare and CVS. Notice
of Suppl. Authority in Opp'n to Defs.' Mot. to Dismiss, ECF No. 43 (July 23, 2021). Defendants
filed a reply to Plaintiffs' notice of supplemental authority on July 29, 2021. Resp. to Pls.' Notice
of Suppl. Authority, ECF No. 45 (July 29, 2021).

On September 30, 2021, the Court granted the Defendants' motion to dismiss on all nine counts, but allowed the Plaintiffs leave to file an Amended Complaint addressing any legal deficiencies by October 29, 2021. Ruling & Order on Mot. To Dismiss, ¶ 30 ECF No. 46 ("Dismissal Order").

On October 29, 2021, Plaintiffs filed the SAC. SAC, ECF No. 49.

On November 24, 2021, Defendants filed their motion to dismiss the SAC. Mot. to Dismiss, ECF No. 55 (Nov. 24, 2021); Mem. of Law in Supp. of Defs.' 2d Mot. to Dismiss, ECF No. 55-1 (Nov. 24, 2021) ("Dismissal Motion").

Soon after on December 18, 2021, Plaintiffs filed a memorandum in opposition to the motion to dismiss. Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss, ECF No. 61 (Dec. 18, 2021) (" 2d Opp'n").

On January 14, 2022 Defendants submitted a reply to the Plaintiffs' memorandum. Reply Mem. of Law in Supp. of Defs.' Mot. to Dismiss, ECF No. 62 (Jan. 14, 2022) ("Defs.' 2d Reply").

On August 26, 2022, Defendants filed a notice of additional authority in support of Defendants motion to dismiss to SAC. Notice of Additional Authority in Supp. of Defs.' Mot. to Dismiss, ECF No. 63 (Aug. 26, 2022) (Add'l Auth.).

## II.   STANDARD OF REVIEW

To survive a motion to dismiss under 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility

standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Recs. LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 358 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also take judicial notice of matters of public record, including documents filed with public bodies, such as articles of incorporation. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (taking

judicial notice of contents of corporate filings with the SEC); *Banks v. Consumer Home Mortg., Inc.*, No. 01-cv-8058, 2003 WL 21251584, at *6 n.7 (E.D.N.Y. Mar. 28, 2003) (taking judicial notice of public record on file with Secretary of State for Georgia); *see also AW Indus., Inc. v. Sleepingwell Mattress Inc.*, No. 10-cv-04439 (NGG) (RER), 2011 WL 4404029, at *4 (E.D.N.Y. Aug. 31, 2011) (noting that the Court can take judicial notice of certificates of amendment and incorporation to analyze the true name of a legal entity in resolving a motion to dismiss), *report and recommendation adopted by* 2011 WL 4406329 (E.D.N.Y. Sept. 21, 2011).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (internal quotation marks omitted).

## III.      DISCUSSION

### A.  The Failure to Seek Leave of Court

Under Rule 15 of the Federal Rules of Civil Procedure, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R.Civ.P.15(a); *see Rose v. Waterbury*, No. 3:12-cv-00291 (VLB) 2013 WL 3967649, at *2 (D. Conn. July 31, 2013) ("[A] plaintiff may not amend its complaint at will."). In addition, in this District, any motion for leave to amend a pleading under Rule 15(a) shall:

> (1) Include a statement of the movant that: (i) the movant has inquired of all non-moving parties and there is agreement or objection to the motion; or (ii) despite diligent effort, including making the inquiry in sufficient time to afford non-movant a reasonable opportunity to respond, the movant cannot ascertain the position(s) of the non-movant(s), and (2) in cases in which the movant is represented by counsel, be accompanied by both a red-lined version of the proposed amended pleading showing the changes proposed against the current pleading and a clean version of the proposed amended pleading.

D. Conn. L. Civ. R. 7(f).

Amended pleadings filed without an opposing party's consent or leave of court may be dismissed. *See Kopperl v. Bain*, No. 3:09-CV-01754 (CSH), 2016 WL 310719 at *5 (D. Conn. Jan. 26, 2016) (dismissing a fourth amended complaint because, *inter* alia, "Plaintiff has not been given leave to replead these counts."); *see also Rose*, 2013 WL 3967649, at *2 (finding that "where a party files an amended complaint where leave or consent is required and no leave or consent has been given, the complaint has no legal force or effect."). And proposed amended pleadings lacking the detail and clarity required by this District's Local Rules especially warrant dismissal. *Cf. Gorham-DiMaggio v. Countrywide Home Loans, Inc.*, 421 F. App'x 97, 101 (2d Cir. 2011) (affirming denial of leave to amend where proposed amendment consisted of "word-for-word reiterations of pleadings already dismissed by the district court").

Defendants move to dismiss the SAC for Plaintiffs' failure to properly file the pleading without asking for leave. They argue that "[i]nstead of attempting to convince the Court that the amendment was justified, plaintiffs opted to leapfrog directly to filing a pleading, without seeking either leave of Court or defendants' consent." Defs.' 2d Mot. at 13. Defendants also note that "Courts routinely dismiss or strike amended complaints that, like the SAC, are filed without first obtaining leave to amend." *Id.* at 14.

In response, Plaintiffs concede that they "fail[ed] to notice the Court's Order, in two places," and have deprived Defendants' "opportunity to preview their dismissal arguments." 2d Opp'n at 8. Plaintiffs proposed to "seek leave nunc pro tunc to submit the SAC for the Court's consideration on the merits." *Id.*

The Court disagrees.

Plaintiffs should have sought leave of Court before filing the Second Amended Complaint, but did not. In this particular case, Plaintiffs have not just circumvented the express language of both Rule 15(a) of the Federal Rules of Civil Procedure, and Rule 7(f), but have undermined their specific purpose here: providing clarity about how the proposed amendments remedy the legal deficiencies carefully laid out by the Court in its earlier ruling. *See Belikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) ("Leave to amend is especially inappropriate where, as here, plaintiffs' proposed amendments merely recycled versions of claims which had already fallen victim to a motion to dismiss.").

As a result, in this limited circumstance—and without reaching the issue of whether dismissal on this basis alone is always required—dismissal of the Second Amended Complaint on this basis alone is appropriate, as a "reasonable response to the problems and needs confronting the court's fair administration of justice . . . [and not] contrary to any express grant of or limitation on

the district's power contained in a rule or statute." *Dietz v.Bouldin*, 136 S. Ct. 1885, 1892 (2016)(citations and internal quotation marks omitted).

Accordingly, for failure to seek leave of this Court before filing the SAC, Defendants' motion to dismiss will be granted.

### B.  Motion to Dismiss as to Failure to State a Claim

Even if the Plaintiffs had sought leave of Court before filing the Second Amended Complaint, it would not have survived this Court's substantive review.

In this Court's previous Ruling and Order, each claim asserted in the Amended Complaint failed for one of two reasons: the failure to allege a viable fiduciary relationship between the Plaintiffs and any of the Defendants sued under ERISA, or the failure to sufficiently allege any wrongdoing cognizable as an ERISA claim.

As to Counts Three, Four, Five, Six, and Seven of the Amended Complaint, the Plaintiffs failed to plausibly allege "that Aetna, CVS, and their individual officers and directors functioned as ERISA fiduciaries." Dismissal Motion at 20.

As to Count One, the duty of prudence claim, against the Aetna Benefit Finance Committee, the Aetna Dole Defendants, and CVS Does 1-10, the Plaintiffs failed to sufficiently allege "that there was material, non-public information to be disclosed." *Id.* at 23.

As to Count Two, the duty of loyalty claim, against the Aetna Benefit Finance Committee, the Aetna Dole Defendants, and Mr. Bertolini, as a non-fiduciary to the Plan, the claim against Mr. Bertolini had to be dismissed; and, as to the Aetna Benefit Finance Committee, and the Aetna Dole Defendants, Plaintiffs failed to plausibly allege a conflict of interest. *Id.* at 27.

As to Count Eight, the co-fiduciary liability claim, Plaintiffs "failed to allege that the Defendants are fiduciaries to the Plan with respect to the Plan's investments and disclosures in the Proxy and Registration Statement." *Id.* at 28.

And finally, as to Count Nine, the knowing participation in breach of ERISA claim, this claim must be premised on an underlying ERISA violation, but, as discussed with respect to the other claims, Plaintiffs failed to "state a breach of fiduciary duty or prohibited transaction claim." *Id.* at 29.

Defendant moves to dismiss the Second Amended Complaint for Plaintiffs' failure to state a claim once again. They argue that the SAC "fails to plausibly allege that CVS's stock was artificially inflated by material non-public information." Defs.' 2d Mot. at 14. Defendants also argue that "the SAC identifies no new information that allegedly should have been disclosed," and "[i]nstead, all that plaintiffs muster is naked argumentation about Judge McMahon's decision denying the motion to dismiss in *Bassan*. *Id.* at 14. Defendants note that "the Court already recognized, the allegations in *Bassan* are no help to plaintiffs, because *Bassan* does not involve allegations that CVS withheld material non-public information from the market." *Id.* at 15.

In response, Plaintiffs argue that "Defendants' motion makes mostly factual arguments against Plaintiffs 'factual allegations." 2d Opp'n at 1. Additionally, Plaintiffs note that "[a] motion to dismiss is obviously not a place to pit fact vs fact or for the Court to pick a winner." *Id.* Moreover, Plaintiffs argue that "[t]he Second Circuit has set the standard in *Pension Benefit Guar. Corp. ex. Rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 718 2d Cir. (direct allegation of imprudence are not necessary if there are facts constituting circumstantial evidence to "reasonably infer" a breach); and *Jander v. Ret. Plans Committee of IBM*, 910 F.3d 620, 628 (2d Cir. 2018) ("No heightened pleading standard applies . . . it is enough to provide the context necessary to show a plausible claim for relief")." *Id.* Plaintiffs note that the Second Circuit provided "guidance on ERISA pleading standards [that] was ignored by Defendants in their Opposition." *Id.*

In reply, Defendants note that "Plaintiffs' Opposition repeats nearly verbatim the arguments

the Court considered and rejected in its Dismissal Order." Defs.' 2d Reply at 1. In addition,

Defendants emphasize that "[t]he SAC leaves plaintiffs little alternative, since it makes only

superficial changes." *Id.* Defendants argue that Plaintiffs are not able to "provide no reason for

this Court to rethink its well-reasoned decision, plaintiffs' implausible legal theories should again

be rejected." *Id.*

The Court agrees, and will address each proposed amendment in turn.

### 1. The Fiduciary Responsibility Issue

In its previous Ruling and Order, the Court held that: "Plaintiffs have not plausibly

alleged that Larry Merlo, then the Chief Executive of CVS; Eva Boratto, CVS's then-Executive

Vice President and Chief Accounting Officer; and Mark Bertolini, Aetna's then-Chairman and

CEO, acted as fiduciaries by drafting or preparing CVS's Joint Proxy Prospectus or

Registration Statement." Dismissal Order at 18. In doing so, the Court followed binding

Supreme Court precedent that fiduciaries are only liable to the extent that were "acting as a

fiduciary . . . when taking the actions subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211,

226 (2000). And none of those Defendants were acting as a fiduciary when they signed or

prepared filings for the SEC, but instead did so in a corporate capacity. *Id.*

Likewise, Aetna and CVS were not fiduciaries either, because under the express

language of the applicable Plan, neither entity had this specific responsibility under ERISA. *See

Id.* at 16 ("Under these provisions, the [Aetna Benefit Finance Committee], not Aetna, was

responsible for the Plan's investment decisions, and the Trustee was responsible for distributing

to Plan participants 'information relating to the purchase, holding, and sale of Stock.'"); *see id.*

at 17 ("The same analysis applies to CVS, which is not a named fiduciary or otherwise

referenced in the Plan.").

In support of the Second Amended Complaint, however, Plaintiffs still maintain that

Aetna and CVS are fiduciaries under ERISA. *See* 2d Opp'n at 16 ("Such authority and responsibility endowed each Chairman of Aetna and CVS (pre- and post-merger, respectively) with fiduciary duties to oversee the Plan, monitor other fiduciaries and determine the imprudence or not of the Stock Fund."). And, in addition to Aetna and CVS, "Merlo, Baratto, and the committees the Defendants named herein had fiduciary responsibilities and exercised same during the Class Period as set forth in governing Plan documents." *Id.*

Defendants respond that Plaintiffs' arguments have "no bearing on whether any defendant, aside from [the Aetna Benefit Finance Committee], had decision-making responsibility for the Plan's investments in the ***Aetna Stock Fund*** – a threshold requirement to sustain plaintiffs' claims." Defs.' Reply at 4 (emphasis in original). Also, for purposes of determining who has fiduciary responsibility, the Plan Document itself vested authority not in Aetna or CVS, but in the [Aetna Benefit Finance Committee]. *Id.* at 5 ("Insofar as plaintiffs are asserting that the duty of prudence required some investment fiduciary to override the Plan Document and alter or remove the Aetna Stock from the Plan, they do not offer any response to defendants' arguments that such responsibility necessarily resided with the [Aetna Benefit Finance Committee]."). Finally, Defendants note that this Court already made clear in its Ruling and Order that "signing a SEC filing is a [sic] **not** a fiduciary act." *Id.* (citation and footnote omitted).

The Court agrees.

For the reasons already stated in the previous Ruling and Order, Plaintiffs still have not plausibly alleged that Aetna, CVS, or any individual officers and directors functioned as ERISA fiduciaries as a matter of law. Instead, as Defendant rightly point out, in contrast to what Plaintiffs now argue, the relevant plan documents state that "(i) 'the Chairman [of Aetna] delegated fiduciary responsibility of the Plan to the [Executive Vice President, Human

Resources],' and (ii) the EVP, in turn, 'delegated the supervision of all financial matters related to the to the Plan to the [Aetna Benefit Finance Committee,]' including the duty to 'establish[ ] and monitor[ ] investment performance, policies, objectives, and guidelines, and approving the number and type of the Plans' investment options.'" Defs.' Reply at 4 (citing ECF No. 49-3 at 1).

In light of this express delegation of authority to the Aetna Benefit Finance Committee, authority emphasized by this Court in its previous Ruling and Order, Plaintiffs' arguments to the contrary fail and the caselaw upon which they rely is inapposite. *See Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 63–65 (2d Cir. 2006) (reversing the dismissal of an ERISA breach of fiduciary claim because the relevant Plan document expressly vested specific discretionary authority in a labor union); *see generally Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76 (2d Cir. 2001) (vacating and remanding summary judgment decision but nowhere suggesting that any entity, other than the Defendant, had the relevant discretionary authority transferred to them).

Finally, Plaintiffs' SEC filing argument fails for the same reasons it failed before in the Court's previous Ruling and Order: the acts alleged do not plausibly establish that any of the individual Defendants acted as a fiduciary. Accordingly, the motion to dismiss any claims based on Aetna, CVS, or any individual officers and directors functioning as ERISA fiduciaries would have been dismissed, even if Plaintiffs had properly sought leave.

## 2.  The Material Non-Public Information Issue

In its previous Ruling and Order, the Court dismissed the duty of prudence claim because the Plaintiffs failed to sufficiently allege "that there was material, non-public information to be disclosed." Dismissal Order at 23.

In their Second Amended Complaint, Plaintiffs now allege that the Proxy Statement and

Registration Statement ("PS/RS") "failed to provide plan participants with truthful, accurate and complete information about the material risks to CVS['s] financial condition and as a result of Omnicare's dependency upon an [Illegal Prescription Scheme] revenue generating scheme." 2d Opp'n at 13.

Plaintiffs also argue that "new allegations regarding the high level management members constituting the integration teams (SAC 115-117) which led by Defendants Merlo and Bertolini (SAC 115-117) and the nature of the information exchanged (SAC 115) and the length of time of the integration teams' work provide ample factual foundation for inferring that ABFC [the Aetna Benefit Finance Committee] and Merlo and Bertolini all had access to the information revealing that the Aetna stock, after the merger vote, was an imprudent investment given that its price was tied to the CVS stock price." *Id.* at 22. As a result, in their view, "[a] prudent fiduciary would investigate the allegations of the illegal conduct and would investigate the declining asset values having received a hint thereof from public disclosures present here." *Id.*

Moreover, Plaintiffs argue that these allegations with respect to the alleged obligation to investigate and discover are sufficient to survive. *See id.* at 25 ("Here as in *Jander*, the Defendants 'allegedly knew that disclosure of the truth . . . was inevitable because IBM [here CVS and Aetna] . . . would be unable to hide its overvaluation from the public at that point." (citing *Jander* 910 F.3d at 630–631)).

In response, Defendants argue that "plaintiffs have failed to identify any new allegation that should cause this Court to reconsider its conclusion that CVS repeatedly 'disclosed its receipt of a federal Civil Investigative Demand relating to Omnicare's roll-over prescription practices . . . in SEC filings during the Class Period.'" Defs.' Reply at 3 (citing Dismissal Order at 23–24). Defendants also note that Plaintiffs do not deny that there was only one additional detail added to the description of the "Illegal Prescription Scheme," Defs.' Reply at 4, n.2 (citing SAC ¶ 74

("There was insufficient public disclosure of the effect on CVS of the gradual ending of the

Illegal Prescription Scheme.")), and argue that "[t]his type of conclusory allegation is insufficient

to disturb the Court's prior dismissal ruling." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555–57 (2007)).

As to the argument that "[a] prudent fiduciary would investigate the allegations of the

illegal conduct and would investigate the declining asset values having received a hint thereof

from public disclosures present here." 2d Opp'n at 22, Defendants argue that Plaintiffs did not

"identify any of these supposed 'red flags,' and the cited allegations do not include information

that would have been available to Plan fiduciaries before . . . December 2019." Defs.' 2d Reply at

7. (citation omitted). "Nor have plaintiffs met their burden of 'explain[ing] in a non-conclusory

fashion *how* plaintiffs' hypothetical investigation would have uncovered the alleged [unspecified]

inside information." *Id.* (footnote omitted).

As to Plaintiffs' *Jander* argument, Defendants respond that this "argument turns a blind

eye to [other] decisions . . . dismiss[ing] claims because they – just like plaintiffs' here –

contained no specific allegations in support of an assertion that disclosure was inevitable and the

harm of non-disclosure would increase over time." *Id.* at 8 (footnote omitted).

The Court agrees.

For the reasons already stated in its previous Ruling and Order, Plaintiffs still have not

plausibly alleged a duty of prudence claim arising from material, non-public information that

CVS participated in the "Illegal Prescription Scheme." Indeed, as Defendants rightly note—for

the most part—Plaintiffs have simply tried to recast arguments already rejected by this Court

before. *See* Ruling and Order at 25 ("[Plaintiffs] do not explain, for example, what, if any,

records were shared with the [Aetna Benefit Finance Committee] during the merger

negotiations. Indeed, Plaintiffs allege that the 2015 *qui tam* action against Omnicare was sealed

until December 2019, when the U.S. Department of Justice publicly intervened in the lawsuit." (citation omitted)).

As the Second Circuit has made clear: "ERISA's fiduciary duty of care . . . requires prudence, not prescience." *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (citation and internal quotation marks omitted); *see id.* at 721 ("[T]he allegation of a decline in price indicates only that the security *turns out to have been, in hindsight,* a bad investment. . . . [A]n allegation that an investment's price dropped, even precipitously, does not alone suffice to state a claim under ERISA." (emphasis in original) (citations omitted)). And the absence of a factual allegation suggesting what information, if any, probative of the alleged "Illegal Prescription Scheme" would have been available before December 2019 undermines Plaintiffs' alleged claim.

Accordingly, Plaintiffs' duty of prudence claim in the Second Amended Complaint would have been dismissed, even if Plaintiffs had sought leave.[1]

### C.  Further Leave to Amend

Given that Plaintiffs already have amended their operative pleading three times, without success, the Court sees no reason to provide yet another opportunity and will dismiss the Second Amended Complaint with prejudice. *See Loc. 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998) (recognizing that a "trial judge's discretion is broad [when deciding whether to grant leave to amend pleadings] and its exercise depends upon many factors, including . . . repeated failure to cure deficiencies by amendments previously allowed" (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962))).

---

[1] For reasons already discussed herein or addressed already in the Court's previous Ruling and Order, any other claims in the Second Amended Complaint not expressly discussed in this decision would have been dismissed for these reasons as well.

**IV.     CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED** with prejudice.

The Clerk of Court is respectfully requested to close this case.

SO ORDERED at Bridgeport, Connecticut, this 30th day of September, 2022.

<u>/s/ Victor A. Bolden</u>
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE